IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

|  |  |  |
|---|---|---|
| MICHAEL SAMPLE, | ⌇ | |
| | ⌇ | |
| Petitioner, | ⌇ | |
| | ⌇ | |
| v. | ⌇ | No. 11-2362-JPM-dkv |
| | ⌇ | |
| ROLAND COLSON, Warden, Riverbend | ⌇ | |
| Maximum Security Institution, | ⌇ | |
| | ⌇ | |
| Respondent. | ⌇ | |
| | ⌇ | |

---

ORDER GRANTING IN PART AND DENYING IN PART
PETITIONER'S MOTION FOR DISCOVERY

---

I.     RELEVANT PROCEDURAL BACKGROUND
II.    TENNESSEE SUPREME COURT SUMMARY
III.   THEORIES OF THE CASE
IV.    BACKGROUND
       A.   Low's Grocery Robberies, August 7 and 29, 1981
       B.   Lillie & Eddie's Grocery Robbery, August 18, 1981
            1.   Testimony of Eddie Wright
            2.   Testimony of Darrell Perry
            3.   Testimony of Gino White[1]
            4.   Testimony of Michael Winfrey
            5.   Non-Testifying Witnesses
            6.   Suspects in Lillie & Eddie's Grocery Robbery
       C.   L & G Grocery Robbery and Murders, August 29, 1981
            1.   Testimony of Melvin Wallace
            2.   Testimony of Charles Rice
            3.   Testimony of Grover Jones
            4.   Testimony of Charles Malone
            5.   Testimony Regarding Petitioner's Arrest
            6.   Non-Testifying Witnesses
            7.   Suspects in the L & G Grocery Robbery and Murders
V.     RELEVANT CLAIMS

---

[1]     This individual's name is spelled "Geno White" in the Motion for Discovery. (See ECF No. 43 at 4.) This individual's name is spelled "Gino White" in the supplemental police report (see ECF No. 44-27 at 5), the trial transcript (see ECF No. 21-4 at 2142), the Amended Petition (see ECF No. 11 at 27), and in the Tennessee Court of Criminal Appeals 2010 Opinion, see Sample v. State, No. W2008-02466-CCA-R3-PD, 2010 WL 2384833, at *17 (Tenn. Crim. App. June 15, 2010). The Court will use the spelling "Gino" to refer to this individual.

VI.  STANDARD
     A.  Discovery Related to Procedurally Defaulted Claims
     B.  Impact on Jury Verdict
     C.  Pinholster
VII. ANALYSIS
     A.  DA & MPD Records ("Request A")
     B.  Charles Rice ("Request B")
         1.  School Records ("Request B1")
         2.  Juvenile Records ("Requests B2-B6")
         3.  Deposition of Charles Rice ("Request B7")
     C.  Alibi Evidence for the L & G Grocery Robbery and Murders,
         the Lillie & Eddie's Grocery Robbery, and the Low's
         Robberies ("Request C")
     D.  Consideration Given to Witnesses ("Request D")
         1.  Melvin Wallace ("Requests D1-D2")
         2.  Charles Malone ("Requests D3-D5")
         3.  Eddie wright ("Request D6")
         4.  Mike Winfrey ("Requests D7-D9")
         5.  Gino White ("Requests D10-D11")
     E.  The L & G Grocery and Grover Jones ("Request E")
         1.  Law Enforcement and Prosecution Files Related to
             Drug Activity ("Requests E1, E3")
         2.  Consideration Given to Grover Jones ("Request E2")
         3.  Deposition of Grover Jones ("Request E4")
     F.  DA & MPD Files Regarding Lillie & Eddie's Grocery
         ("Request F")
     G.  Law Enforcement Records Related to Drugs at Lillie &
         Eddie's Grocery ("Request G")
     H.  DA and MPD Records for the Low's Grocery Robberies
         ("Request H")
     I.  Certain Individuals' MPD and DA files ("Request I")
         1.  Individuals Suspected of Participating in the
             August 29, 1981, Robbery and Murders at the L & G
             Grocery and/or Individuals who Knew of the Ongoing
             Criminal Activities at the L & G Grocery ("Request
             I1")
         2.  Individuals Suspected in the Robbery of, and/or
             Familiar with Ongoing Criminal Activities at,
             Lillie & Eddie's Grocery ("Request I2")
         3.  Individuals Suspected of Participating in the
             August 7, 1981, and August 29, 1981, Low's Grocery
             Robberies ("Request I3")
VIII.   CONCLUSION

## I. RELEVANT PROCEDURAL BACKGROUND

On August 2, 2012, Petitioner Michael Sample, through counsel,
filed a Motion for Discovery and a supporting memorandum. (ECF
No. 43; ECF No. 44.) On September 4, 2012, Respondent filed a

Response. (ECF No. 46.) Petitioner replied on September 18, 2012. (ECF No. 48.) On October 5, 2012, Respondent filed a "Supplemental Response to Petitioner's Reply to Respondent's Discovery Motion Response." (ECF No. 52.) On October 10, 2012, Petitioner filed a "Reply to Respondent's Supplemental Response Regarding Motion for Discovery." (ECF No. 54.) On March 27, 2013, Respondent filed a "Notice of Supplemental Authority in Support of Responses to Petitioner's Motion for Discovery." (ECF No. 56.) On April 8, 2013, Petitioner filed a "Notice of Supplemental Authority." (ECF No. 57.)

For the following reasons, Petitioner's Motion for Discovery is GRANTED IN PART and DENIED IN PART.

## II. TENNESSEE SUPREME COURT SUMMARY

The Tennessee Supreme Court, in its opinion issued October 15, 1984, summarized the facts of the case as follows:

> On August 29, 1981, at approximately 11:00 p.m. Melvin Wallace, Jr., went into the L & G Sundry Store at 1069 North Watkins in Memphis to purchase two barbecue sandwiches. When he entered, there were four men in the Sundry Store, including two clerks, Benjamin Cooke and Steve Jones, who were known to Wallace as he was a regular customer. The other two black men were the defendants, Larry McKay and Michael Eugene Sample. Wallace did not know them but positively identified them in a line-up at 2:43 p.m. on August 31, 1981, as the murderers of Cooke and Jones and Sample as the person who shot him in the thigh and back and attempted to shoot him in the head.
>
> Wallace testified that he went to the back of the store where Cooke had gone to prepare the sandwiches. McKay was also standing in the back with a quart of 45 Beer mumbling to himself. Not wanting to get involved with a drunk, Wallace turned and directed his attention to the front of the store where Jones and defendant Sample were standing. When he thought the sandwiches would be ready, he looked around at Cooke and saw that

3

McKay had gone behind the counter and was holding a gun at Cooke's head. When Wallace realized "it was a robbery" and "broke and ran for the front door," Sample hollered for him to halt and shot him in the thigh. Wallace tried to play dead but Sample came over and said, "This nigger ain't dead," and shot him in the back. Wallace had heard Sample demanding that Jones give him all the money and heard Jones say, "Man, I gave you everything I had." After hearing Sample say several times, "I ought to kill all you son-of-a-bitches," Wallace heard him say, "Kill every son-of-a-bitch in here," and the defendants started shooting. Wallace testified he saw McKay shoot Cooke in the head. Sample came back to where Wallace was lying on the floor and put a pistol to his head. It clicked several times and did not go off. Wallace testified that he "came up off the floor" and started wrestling with Sample. The gun went off past Wallace's head and he lapsed into unconsciousness. When Wallace woke up, he heard Sample say, "Let's get the hell out of here."

Cooke and Jones died from the bullet wounds to their heads; but when the police arrived shortly after the killers left, Wallace was able to give them information about the episode and gave a description of the killers while he was receiving medical care at the scene and at the hospital. One of the investigating officers remembered that a grocery store across the street from the L & G Sundry Store had been robbed about ten days earlier, and that the witnesses had said the robbers were two black males wearing blue-green surgical caps. Among the items taken in that robbery was a .45 caliber automatic pistol that had a tendency to misfire. Shell casings from a .45 caliber automatic were found in the Sundry Store; and putting together leads from the two robberies, the police apprehended Sample and McKay the next day. They were in a car with a third man, and the .45 automatic with the serial number of the pistol stolen from the grocery across the street was found on McKay. A .32 caliber revolver was found inside the car. Bullets recovered from Jones' cheek, Cooke's head and chest and Wallace's leg had been fired from the .32 caliber revolver found in the car. Two blue hospital surgical caps were found in the car. More than two hundred and perhaps as much as seven hundred dollars in cash was stolen from the Sundry Store; and McKay, who was unemployed, had $166.30 on his person when arrested. Sample had $195 in cash at that time. The third man in the vehicle testified to incriminating circumstances linking defendants to recent criminal activity.

Charles Rice, age sixteen, went to the L & G Sundry Store to buy cigarettes and as he arrived at the door he

saw the robbery in progress, specifically the gun pointed at the head of one of the clerks. He turned and ran home and told his mother what he had seen and later reported the information to the police. He made a positive identification of both defendants.

State v. McKay, 680 S.W.2d 447, 448-49 (Tenn. 1984).

### III. THEORIES OF THE CASE

The prosecution's theory was that Petitioner and Larry McKay committed both the L & G Sundry Store ("L & G Grocery") robbery and murders and the Lillie and Eddie's Grocery Store ("Lillie & Eddie's Grocery") robbery. The prosecution used evidence from the Lillie & Eddie's Grocery robbery to identify the defendants and prove their guilt. (See, e.g., ECF No. 21-1 at 1764.) At the L & G Grocery robbery and murder trial (the "L & G Grocery trial"), the prosecution focused on the following evidence: (1) the similarities between the descriptions of the Lillie & Eddie's Grocery robbers and the L & G Grocery robbers (see id.; ECF No. 21-6 at 2471); (2) the serial number on the .45 caliber automatic weapon, which was found on Petitioner's co-defendant at his arrest, matched the serial number of the gun stolen from Lillie & Eddie's Grocery (see ECF No. 21-1 at 1765; ECF No. 21-6 at 2464); (3) the shell casings found at the L & G Grocery matched shell casings from the .45 caliber automatic weapon stolen from Lillie & Eddie's Grocery (see ECF No. 21-1 at 1767); (4) the general description of the Lillie & Eddie's Grocery robbers matched Petitioner, McKay, and Charles Malone and the car that they were in at the time of their arrest matched the description of the car from the Lillie & Eddie's Grocery robbery (see id. at 1764; ECF No. 21-6 at 2470-71); (5) the

5

.32 caliber revolver confiscated at Petitioner's arrest was matched to the .32 caliber slugs taken from Melvin Wallace, Steve Jones, and Benjamin Cooke's bodies (see ECF No. 21-1 at 1766-67; ECF No. 21-6 at 2479-80); (6) the eyewitness identification of the defendants by Melvin Wallace, Charles Rice, and Eddie Wright (see ECF No. 21-6 at 2476-78); and (7) the testimony of Charles Malone, see infra pp. 21-22, regarding the events that occurred just prior to the defendants' arrest (see ECF No. 21-6 at 2472, 2476).

Defense counsel presented no evidence the L & G Grocery trial. Instead, the defense focused on the following: (1) whether the prosecution could prove its case beyond a reasonable doubt and to a moral certainty (see ECF No. 21-1 at 1770; ECF No. 21-7 at 2519-21); (2) whether the identification of Petitioner was tainted (see ECF No. 21-7 at 2524-25); (3) whether Charles Malone's testimony was reliable (see id. at 2534-35); (4) whether Grover Jones' testimony, the store's owner and victim Steve Jones' uncle, about his ability to make six hundred dollars in just two hours selling barbecue and other food items was truthful and whether Grover Jones was instead engaging in illegal activity through his store (see id. at 2521-22); (5) whether Melvin Wallace and Charles Rice's identifications of Petitioner were credible (see id. at 2523-27); and (6) whether the person Grover Jones identified as "Junebug" was the person that should be on trial (see id. at 2522).

## IV. BACKGROUND

Three other robberies were investigated in conjunction with the L & G Grocery robbery and murders: the August 18, 1981, robbery

6

of Lillie & Eddie's Grocery Store; and the August 7, 1981, and August 29, 1981, robberies of Low's Cash Grocery ("Low's Grocery"). (See ECF No. 44-1 at 13.) Petitioner and McKay were ultimately indicted for "murder during the perpetration of a robbery with a deadly weapon and murder in the first degree" for each of the August 29, 1981, L & G Grocery murders. (See ECF No. 21-1 at 1760.)

Jury selection in the L & G Grocery trial began October 18, 1982. (See ECF No. 19-10 at 1, 22.) The prosecution's case-in-chief commenced October 28, 1982. (ECF No. 21-1 at 1757.) Both Petitioner and his co-defendant McKay pled not guilty to all charges. (ECF No. 21-1 at 1759-60.) The following individuals[2] relevant to Petitioner's Motion for Discovery testified regarding the L & G Grocery robbery and murders: Melvin Wallace, the surviving L & G Grocery victim (ECF Nos. 21-2 to -3 at 1864-1939); Charles Rice, witness to the L & G Grocery robbery (ECF Nos. 21-4 to -5 at 2192-2236); Grover Jones, owner of the L & G Grocery and uncle to victim Steve Jones (ECF No. 21-2 at 1783-1815); and Charles Malone, who was arrested with Petitioner and McKay on August 30, 1981. (ECF No. 21-5 at 2301-27; see ECF No. 44-1 at 1.)

---

[2] The witnesses who testified at the L & G Grocery trial in the guilt phase, in order of their testimony, are as follows: Margaret B. Cooke, Grover Jones, Jr., Charles Warren Harlan, Thomas M. Carr, Joe Dan Welch, Melvin Wallace, Jr., William B. Dawkins, Ray O. Schwill, II, Robert G. Franklin, Eddie Louis Wright, Darrell Perry, Gino White, Mike Bernard Winfrey, Charles Everett Rice, Delores Rice, A. J. Walton, Randy Oliver, C. J. Harrell, Charles Everett Malone, Terry G. Hayes, James D. Douglas, Barney Wright, and Patrick Vincent Garland. (See ECF No. 21-2 at lxix; ECF No. 21-3 at lxxii; ECF No. 21-4 at lxxvi; ECF No. 21-5 at lxxix; ECF No. 21-6 at lxxxii.) The witnesses who testified at the L & G Grocery trial in the sentencing phase, in order of their testimony, are as follows: Ginger Reynolds, James E. Hudson, Larry McKay, Gloria Ann Brown, Thelma McKay, Douglas E. Browning, Danny Antwine, Beverly Sample Payne, Maybelline Yancy, Emmanuel Yancy, Osborne Lumpkin, and Nancy Jean Edmonds. (See ECF No. 21-7 at lxxxv-lxxxvii.)

Evidence regarding the Lillie & Eddie's Grocery robbery was also admitted at the L & G Grocery trial.[3] The following individuals relevant to Petitioner's Motion for Discovery testified regarding the Lillie & Eddie's Grocery robbery: Eddie Louis Wright, owner of Lillie & Eddie's Grocery and witness to the Lillie & Eddie's Grocery robbery (ECF Nos. 21-3 to -4 at 2012-82); Darrell Perry, witness to the Lillie & Eddie's Grocery robbery (ECF No. 21-4 at 2082-87, 2116-42); Gino White, witness to the Lillie & Eddie's Grocery robbery (ECF No. 21-4 at 2142-69); and Mike Bernard Winfrey,[4] witness to the Lillie & Eddie's Grocery robbery (ECF No. 21-4 at 2170-87). There was no testimony regarding the Low's Grocery robberies at the L & G Grocery trial. (See ECF Nos. 19-9 to -10; ECF Nos. 20-1 to -10; ECF Nos. 21-1 to -7); see also Sample, 2010 WL 2384833, at *19.

The jury began its deliberations at 9:50 a.m. on November 3, 1982, and returned a verdict at 11:25 a.m. that same day finding Petitioner and McKay guilty of two counts of felony murder. (ECF No. 21-7 at 2570-72); see Sample, 2010 WL 2384833, at *1.

In his Motion for Discovery, Petitioner seeks information related to not only the L & G Grocery robbery and murders but also the Lillie & Eddie's Grocery and Low's Grocery robberies. Petitioner asserts that these other crimes are relevant to Petitioner's case because of identification issues raised at the

---

[3]     The prosecution introduced evidence regarding the Lillie & Eddie's Grocery robbery at the L & G Grocery trial for the reasons articulated in Section III. See supra pp. 5-6.

[4]     Winfrey is also known as Mike "Funches." (ECF No. 21-4 at 2170.)

L & G Grocery trial and during his post-conviction proceedings. See Sample, 2010 WL 2384833, at *4-7, *17-19. The Low's Grocery robberies, Lillie & Eddie's Grocery robbery, and L & G Grocery robbery and murders are addressed in turn.

## A. Low's Grocery Robberies, August 7 and 29, 1981

Annie and Tommy Low[5] owned Low's Grocery, which was robbed twice: once on August 7, 1981, and once at approximately 3:00 p.m. on August 29, 1981, eight hours before the L & G Grocery robbery and murders. Id. at *19. Low's Grocery was located at 608 East Trigg Avenue.[6] (See ECF No. 44-35.) Annie and Tommy Low were present during both robberies. (See ECF Nos. 44-35 to -38.) James Nunnley and his friend Jackie witnessed the Low's Grocery robbery on August 7, 1981. (ECF No. 44-1 at 20.) Franklin Wright, a twelve-year-old girl, witnessed the Low's Grocery robbery on August 29, 1981, and provided a statement to the police. (ECF No. 44-47.)

Both Annie and Tommy Low identified McKay as the perpetrator of the August 7, 1981, and August 29, 1981, robberies in a lineup on August 31, 1981, at 2:43 p.m. (See ECF No. 44-14.) Annie Low tentatively identified Ralph Franklin, McKay's cousin (see ECF No. 21-5 at 2313), as the other perpetrator at this first lineup. (See ECF No. 44-36 at 3; see also ECF No. 44-14.) Annie and Tommy Low viewed a second lineup on August 31, 1981, at 2:55 p.m., in

---

[5]    The last name is spelled "Lowe" in the Tennessee Court of Criminal Appeals' opinion. See Sample, 2010 WL 2384833, at *4, *19. However, the witness statements that were produced are signed "Low." (See ECF Nos. 44-35 to -38.)

[6]    Low's Grocery is located in a different section of Memphis than the L & G Grocery and Lillie & Eddie's Grocery. (See ECF No. 44-2.)

which Petitioner was the person at the first position in the lineup. (<u>See</u> ECF No. 44-12.) Neither Annie nor Tommy Low identified Petitioner at this lineup. (<u>See</u> <u>id.</u>)[7] Franklin Wright identified Tommy Lee Bradford in a photographic lineup as one of the perpetrators. (ECF No. 44-44 at 2.)

**B.   Lillie & Eddie's Grocery Robbery, August 18, 1981**

Eddie Louis Wright was the owner of Lillie & Eddie's Grocery, which was robbed on August 18, 1981. (ECF No. 21-3 at 2012-18.) Lillie & Eddie's Grocery was located at 1062 North Watkins Street, across the street from the L & G Grocery. (<u>Id.</u> at 2012-13.) Testimony about the Lillie & Eddie's Grocery robbery was admitted at the L & G Grocery trial. (<u>See, e.g.</u>, ECF Nos. 21-3 to -4.)

**1.   Testimony of Eddie Wright**

Eddie Wright testified at Petitioner's trial about the Lillie & Eddie's Grocery robbery that occurred on August 18, 1981. Wright was a witness to the robbery. Wright stated that two black males entered the store wearing blue or green hospital surgical caps. (ECF No. 21-3 at 2013, 2019.) The shorter of the two men walked up to the counter and made a purchase. (<u>Id.</u> at 2013.) The taller of the two men walked over to the meat counter. (<u>Id.</u>) The shorter man at the counter asked for soap pads. (<u>Id.</u>) After Wright told him

---

[7]      The Tennessee Court of Criminal Appeals stated that Annie Low "tentatively identified" Petitioner as the second man involved in the robbery. <u>Sample</u>, 2010 WL 2384833, at *19. However, the individual Annie Low tentatively identified at the first lineup in position number six was Ralph Franklin, not Petitioner. <u>Compare</u> <u>Sample</u>, 2010 WL 2384833, at *7, *19 ("Mrs. Lowe said the following about Petitioner Sample, who was number six in the lineup, 'Number six, I am not to[o] positive about him being the second guy involved, the one who snatched the money from our drawer in the register, but without a doubt number four was the one who held us up twice.'"), <u>with</u> (ECF No. 44-36 at 3), (ECF No. 44-35 at 1), (ECF No. 44-12), <u>and</u> (ECF No. 44-14).

they did not have any, the shorter man walked to the back of the store, came back with a bag of chips, and laid them on the counter. (Id.) The shorter man said, "Set this money out" and started hitting the register, trying to open it. (Id.) Wright testified,

> I thought he was playing, and then I looked up and I saw the taller male had a gun pointed at one of the kids that was in the store. It might have been pointed at me, but in the direction the kid was standing, the gun was pointed towards him. Then the shorter one jumped over the counter and said, "Open the register."

(Id. at 2014-2015.) The shorter man asked if Wright had a gun, and Wright told him "no." (Id. at 2015.) The shorter man then started searching for a gun and about seven to eight minutes later the shorter man found a gun under the counter. (Id.) The gun was a .45 caliber automatic that Wright's son Michael had given him. (Id.) The gun would occasionally misfire. (Id.)

The shorter man put Wright's gun in his belt and asked him for his rings. (Id. at 2017.) Wright was not wearing any rings at the time. (Id.) The shorter man started taking the money out of the register and putting it in a paper sack which fell apart. (Id.) Billy Smith, one of the Lillie & Eddie's Grocery employees, offered to get a bigger sack, and the man took the gun out and bumped Smith in the side with it and told him, "Hell, no. I don't want you to do a damn thing." (Id.; see ECF No. 21-4 at 2086.)

The taller man was standing near the entrance to the store holding a gun and pointing it towards the people in the store. (ECF No. 21-3 at 2016.) The taller man told Wright, "Take that change out of there, too," and "Get some of them Kool cigarettes off there." (Id. at 2017.)

The shorter man forced everyone into the store's bathroom. (Id.) The kids in the store started running. (Id.) The shorter man tried to fire the gun in the ceiling but the gun misfired. (Id. at 2018.) The perpetrators exited the store and Wright called the police. (Id.) Wright gave the police a description of the men and the gun that was taken. (Id. at 2018-19.)

The night of the L & G Grocery robbery, Eddie Wright talked to the police and told them about the Lillie & Eddie's Grocery robbery and the .45 caliber gun that was taken. (Id. at 2020; see ECF No. 44-1 at 3.) The police asked Wright if he knew the serial number of the gun. (ECF No. 21-3 at 2020.) Michael Wright, Eddie Wright's son, gave the police the box for the pistol and some spent "hulls" (i.e., shell casings). (Id. at 2019-21; see ECF No. 44-1 at 6.)

Eddie Wright viewed a lineup on August 31, 1981, at 2:55 p.m. (ECF No. 44-12.) Wright stated that he was unable to identify anyone in the lineup. (ECF No. 44-32 at 1.) Wright further stated that the person at position number one in the lineup, Petitioner, and the person at number two in the lineup resembled one of the robbers, but both looked a "little lighter" than the robber. (Id.; see ECF No. 21-3 at 2028-29.)[8] At trial, Wright identified Petitioner as the taller perpetrator (ECF No. 21-3 at 2024), and McKay as the shorter perpetrator (id. at 2022).

---

[8]    Wright identified McKay in the lineup at 2:43 p.m. on the same day. (ECF No. 44-14.)

Wright also identified a .32 caliber gun presented at trial as one resembling the gun that the taller man held during the robbery. (ECF No. 44-32 at 1-2.) At trial, Wright testified that the gun the taller man was holding did not have a trigger guard. (ECF No. 21-3 at 2025.)

**2.   Testimony of Darrell Perry**

Darrell Perry, sixteen years old at the time of the L & G Grocery trial, testified about the Lillie & Eddie's Grocery robbery that occurred on August 18, 1981. Perry was a witness to the robbery. Perry testified that he was in Lillie & Eddie's Grocery at about 9:00 p.m. on August 18, 1981, when two men walked in. (ECF No. 21-4 at 2082-83.) Perry stated that the taller man walked by the meat counter and tried "to hide his face [so] nobody would see him." (Id. at 2085.) The shorter man said "Stick up" and jumped over the counter. (Id.) Perry was next to the door, and the taller man reached across him with the gun. (Id. at 2085-86.) The taller man would hide the gun between his own legs when people came into the store and would then push the people to the side after they entered. (Id. at 2086-87.)

On August 26, 1982, Perry and witness Billy Smith viewed photographs at the district attorney's office. (Id. at 2116-17, 2132.) Perry picked Petitioner's photograph from the group as one of the perpetrators and, at trial, identified Petitioner as the taller robber at Lillie & Eddie's Grocery on August 18, 1981. (Id. at 2116-18, 2140.) Perry did not identify McKay. (Id. at 2121.)

### 3.   Testimony of Gino White

Gino White, fourteen years old at the time of the L & G Grocery trial, testified about the Lillie & Eddie's Grocery robbery that occurred on August 18, 1981. White was a witness to the robbery. (<u>Id.</u> at 2142-43.) White testified that he was standing by the taller robber who was holding a short pistol that he described as not having a "handle on it where you stick your finger through [] and pull the trigger." (<u>Id.</u> at 2145, 2165.) On August 25, 1982, White viewed photographs at the district attorney's office. (<u>Id.</u> at 2147-48.) White identified Petitioner as the taller robber in one of the photographs based on a cut on the taller robber's eye. (<u>Id.</u>); <u>see</u> <u>Sample</u>, 2010 WL 2384833, at *17. At trial, White identified both Petitioner and McKay as the Lillie & Eddie's Grocery robbers. (<u>Id.</u> at 2149.)

### 4.   Testimony of Michael Winfrey

Mike Winfrey testified about the Lillie & Eddie's Grocery robbery that occurred on August 18, 1981. On the night of the Lillie & Eddie's Grocery robbery, Winfrey was standing in front of Lillie & Eddie's Grocery near the gas pump. (<u>Id.</u> at 2170-71.) Winfrey testified that he saw two men come out of the store and run to the car after the robbery. (<u>Id.</u> at 2171.) Winfrey identified a photograph of a two-tone blue Mercury with Cragar rims and a little "white antenna on the back" as the car parked behind the store to

which the robbers ran. (<u>Id.</u> at 2171-72, 2174-75.)[9] He provided a description of the car to the police. (<u>Id.</u> at 2175.)

Winfrey testified that he saw the taller robber's face. (<u>Id.</u> at 2174.) On August 27, 1982, Winfrey identified Petitioner, based on a photograph, as one of the robbers. (<u>Id.</u> at 2175-76.) Winfrey identified Petitioner in court at the L & G Grocery trial as one of the Lillie & Eddie's Grocery robbers. (<u>Id.</u> at 2176.)[10] Winfrey did not identify McKay as one of the robbers.

### 5.   Non-Testifying Witnesses

Other witnesses to the Lillie & Eddie's Grocery robbery who did not testify at the L & G Grocery trial include Willie Everett,[11] Berry Chambers, Billy Smith, and Johnny Lynn Smith. (ECF No. 44-1 at 11, 13, 15-18.)

### 6.   Suspects in the Lillie & Eddie's Grocery Robbery

Petitioner requests information regarding certain individuals who were considered suspects in the Lillie & Eddie's Grocery robbery including Sammy House and Marvin Phillips. (<u>See</u> ECF No. 43 at 9.)

---

[9]     Winfrey testified that before the robbery, the car was parked across the street. (ECF No. 21-4 at 2183.)

[10]     On cross-examination, Petitioner's counsel tried to imply that Winfrey's identification was based on Winfrey seeing Petitioner at a motion hearing prior to trial; Winfrey testified he did not see Petitioner's face at the hearing and that his identification was based solely on seeing Petitioner at the store. (ECF No. 21-4 at 2184-86.)

[11]     Everett now goes by the name Eddie Willie Hunt. (<u>See</u> ECF No. 44-28, ¶ 2.) He was across the street at the time of the Lillie & Eddie's Grocery robbery and told the police about "three black dudes in a blue Mercury, 1973 or '74" who were involved in the Lillie & Eddie's Grocery robbery. <u>Sample</u>, 2010 WL 2384833, at *18; (<u>see</u> ECF No. 44-46). Everett identified a car that reportedly belonged to Marvin Phillips. <u>Sample</u>, 2010 WL 2384833, at *5; (<u>see</u> ECF No. 44-46 at 1-2).

Sammy House was identified in a supplemental police report as a known hold-up man who Eddie Wright was told may have been involved in the Lillie & Eddie's Grocery robbery.[12] (See ECF No. 44-30 at 4.) Marvin Phillips' car, a blue Chevy with tinted windows, was identified by Eddie Wright as possibly being associated with the L & E Grocery robbery. (Id.) The police investigated Marvin Phillips in relation to the Lillie & Eddie's Grocery robbery. (Id. at 6-7.) Willie Everett also noted a car similar to Phillips's car was present on the night of the robbery. (ECF No. 44-46 at 1-2.)

## C.   L & G Grocery Robbery and Murders, August 29, 1981

Grover Jones owned the L & G Grocery where two individuals, including his nephew, were shot and killed during an armed robbery on August 29, 1981. Sample, 2010 WL 2384833, at *16. The L & G Grocery was located at 1069 North Watkins Street, across the street from Lillie & Eddie's Grocery. Id. at *1.

### 1.   Testimony of Melvin Wallace

Melvin Wallace testified about the August 29, 1981, L & G Grocery robbery and murders. Wallace was a witness to, and victim of, the L & G Grocery incident. Wallace testified that at about 11:20 p.m. on August 29, 1981, he went to the L & G Grocery to purchase barbecue sandwiches on his way home from work. (ECF No. 21-2 at 1864-65.) There were five people standing inside the store when Wallace arrived. (Id. at 1865-66.) Benjamin Cooke went to the back of the store to make the sandwiches for Wallace. (Id. at

---

[12]   Petitioner raised issues regarding the disclosure of information regarding House in the post-conviction proceedings. Sample, 2010 WL 2384833, at *3, *5-6, *17-18.

1866.) Wallace made an in-court identification of Petitioner and McKay as being present at the robbery. (Id. at 1866-68.) Wallace stated that McKay had "a quart of 45 beer and was mumbling to himself" and that he thought McKay was just another drunk. (Id. at 1867-68.) When Wallace turned around to look at the front of the store, he saw McKay behind the counter pointing a gun at Cooke's head. (Id. at 1868-70.)

After Wallace realized that there was a robbery taking place, he ran for the front door. (Id. at 1870.) He got half the distance to the door before Petitioner said, "Halt, nigger. I'll shoot." (Id.) Petitioner then shot him in the thigh, and Wallace spun around and fell. (Id. at 1871.) Wallace attempted to play dead. (Id. at 1871-72.) The bullet hit a nerve in his thigh, however, and his leg was shaking. (Id. at 1872.)

Wallace heard Petitioner say twice, "I ought to kill all you son-of-a-bitches." (Id. at 1871.) Petitioner asked Steve Jones, the other clerk, for all the money. (Id.) Wallace heard Jones say, "Man, I gave you everything I had." (Id.) Petitioner said, "Give me everything below and behind the counter." (Id.) Finally, Petitioner said, "Kill every son-of-a-bitch in here," and Petitioner and McKay began shooting. (Id.)

After McKay and Petitioner shot Cooke and Jones, Petitioner walked over to Wallace and said, "This nigger ain't dead." (Id. at 1872.) Wallace was lying face-down on the floor when Petitioner shot him in the back. (Id.) Wallace testified that Petitioner "put the pistol to my head, and it click, click, click. It didn't go

17

off." (Id.) Wallace wrestled with Petitioner, and the gun went off past his head. (Id.) Wallace passed out, and when he awoke, he heard someone say, "Let's get the hell out of here." (Id. at 1872, 1874.) Wallace testified that he saw McKay pull Benjamin Cooke up and shoot him in the head prior to passing out. (Id. at 1873.) He did not see Steve Jones being shot. (Id. at 1873-74.)

Wallace lay on the floor for a period of time before moving around the corner to conceal himself behind some boxes. (Id. at 1874.) He remained there until the police arrived. (Id.) Wallace gave the police a general description of what he had witnessed before he was taken to the hospital. (Id. at 1875.) At the hospital, doctors removed one bullet from Wallace's thigh. (Id. at 1875-76.) The other bullet remained in Wallace's back. (Id. at 1876.)

On August 31, 1981, Wallace viewed two lineups. (Id. at 1877.) At the first lineup at 2:43 p.m., Wallace identified the person at position four, McKay, as one of the perpetrators, and tentatively identified the person at position six, Ralph Franklin, as the other perpetrator. (ECF No. 44-14; ECF No. 21-2 at 1878-80, 1883-84.) At 2:55 p.m., Wallace viewed a second lineup. (See ECF No. 44-12.) Petitioner was the person at the first position in the second lineup, but Wallace did not identify Petitioner as one of the perpetrators. (Id.; ECF No. 21-2 at 1881-82.)

Wallace identified Petitioner for the first time in court during the L & G Grocery trial. (See ECF No. 21-2 at 1867-68, 1884-85.) Wallace testified that he recognized Petitioner in the second

18

lineup, but he did not write it down because he was sick and taking medication. (<u>Id.</u> at 1885-86.)

## 2.   Testimony of Charles Rice

Charles Rice testified at trial about the August 29, 1981, L & G Grocery robbery and murders. Rice was seventeen years old when he testified. (ECF No. 21-4 at 2197.) Rice testified that on the night of August 29, 1981, he went to the L & G Grocery to get a quart of beer and a pack of cigarettes. (ECF No. 21-4 at 2197.) After getting the cigarettes, Rice left the L & G Grocery and walked to the street corner. (<u>Id.</u> at 2198.) Rice returned to the L & G Grocery after hearing a noise that sounded like firecrackers. (<u>Id.</u> at 2199.) When Rice returned to the L & G Grocery he looked through the glass door into the store. (<u>Id.</u>) Rice testified that he saw McKay holding Steve Jones by the collar with a pistol pressed against Jones' head. (<u>Id.</u> at 2200-01, 2213.) Rice testified that he did not have a good view of Benjamin Cooke. (<u>Id.</u> at 2201-02.) Rice then ran home. (<u>Id.</u> at 2203.) Rice returned to the store later that night with his mother's boyfriend. (<u>Id.</u>) He did not speak to the police at that time because he "didn't want to get involved right then." (<u>Id.</u>)

Rice testified that the police came to talk to him on the morning of August 30, 1981. (<u>Id.</u>) His mother encouraged him to tell the police what he had witnessed the night before at the L & G Grocery. (<u>Id.</u> at 2204.) On August 31, 1981, Rice viewed two photographic lineups at police headquarters. (<u>Id.</u>) At the first lineup, Rice identified the person at position number seven,

19

Charles Edward Malone,[13] as one of the perpetrators. (See ECF No. 44-26.) Rice testified at the L & G Grocery trial that at the time of the first lineup, he was not positive that the person he identified was the perpetrator. (ECF No. 21-4 at 2208.) Rice further testified that he identified the person at position number seven in the lineup because that person closely resembled McKay, who Rice identified in court at the L & G Grocery trial as one of the perpetrators. (Id. at 2209-10.) At the second lineup, Rice identified the person at position number five as the person who was holding Steve Jones by the collar. (ECF No. 44-48 at 3.) At trial, Rice testified that he identified the person at position number five as one of the perpetrators and identified that person in court as Petitioner. (ECF No. 21-4 at 2210-13; see ECF No. 44-26.)

### 3.    Testimony of Grover Jones

Grover Jones, uncle of Steve Jones and owner of the L & G Grocery, testified regarding the August 29, 1981, L & G Grocery robbery and murders. Grover Jones was not a witness to the robbery and murders. At trial, Grover Jones testified that Steve Jones had been living with him and working in his store. (ECF No. 21-2 at 1784.) Grover Jones last saw Steve Jones and Benjamin Cooke at about 8:00 or 9:00 p.m. on the night of August 29, 1981, when Grover Jones left the store. (Id. at 1785-86.) Grover Jones

---

[13]    At trial, this individual's name is listed as Charles "Everett" Malone. (See ECF No. 21-5 at 2301.) Charles Malone was in the car with Petitioner and McKay when they were arrested. (See ECF No. 21-5 at 2305-06, 2310-11.) Malone had a child with McKay's sister Brenda. (Id. at 2321; ECF No. 44 at 2.) Malone and Petitioner met for the first time the day they were arrested. (See ECF No. 21-5 at 2309; ECF No. 44 at 2.)

testified that he left approximately two hundred dollars in cash at the store in a small brown bag. (Id. at 1788-89.)

Grover Jones testified that, on the night of the robbery, he was notified that he had a phone call and returned to the store. (Id. at 1789-90.) Upon arrival, the police questioned Grover Jones about the crime. (Id. at 1790.) Grover Jones later discovered that approximately six or seven hundred dollars were missing. (Id. at 1790-92.) Based on the description that police gave Grover Jones, Jones told the police that the crime may have been committed by a man named "Junebug"[14] because they had trouble with him "in the neighborhood for breaking in." (Id. at 1810-12.)[15]

### 4.   Testimony of Charles Malone

Charles Malone testified about the August 29, 1981, L & G Grocery robbery and murders. Malone was not a witness to the L & G incident. Malone was arrested with Petitioner and McKay, but was later released. (ECF No. 21-5 at 2322.) Malone testified at the L & G Grocery trial about circumstances linking the Petitioner and McKay to the crime. (Id. at 2301-14.) Malone testified that McKay came over to his house flashing money and asked Malone to ride with

---

[14]     According to Petitioner, Leeaster McKay, Jr., aka "Junebug," is Larry McKay's brother. (ECF No. 11 at 16.) Charles Malone told police that McKay had a brother that they call "June Bug." (ECF No. 44-11 at 3.)

[15]     A supplementary offense report dated August 30, 1981, written by Sergeant D.R. Malone, stated that Grover Jones was asked if marijuana was sold from the L & G Grocery based on the presence of two boxes of nickel bags in the store. (ECF No. 44-30 at 2.) The report also stated that over the last year or so, the police had served a warrant on the L & G Grocery and police found a "considerable amount of marijuana in the meat coolers." (Id. at 3.) Grover Jones stated that they just sold nickel bags and not marijuana. (Id.) The report opined that Grover Jones was not telling police all he knew about the drug activity and money at the store. (Id.) In the post-conviction proceedings, Petitioner alleged that the State failed to produce this document. Sample, 2010 WL 2384833, at *3.

him. (Id. at 2302.) While in the car, McKay told Malone to look at
an article in the newspaper about the L & G Grocery robbery, and
McKay said, "Check this out . . . . Man, I seen so much blood last
night it wasn't funny." (Id. at 2304-06.) They then went to the bus
station, and McKay asked Malone to buy him a bus ticket to Chicago
under the name "Larry Graham." (Id. at 2306-07.) After leaving the
bus station they drove to a corner grocery store on Danny Thomas
Boulevard and were subsequently arrested. (Id. at 2308, 2310-11.)

**5.   Testimony Regarding Petitioner's Arrest**

Patrolman A.J. Walton testified about Petitioner's arrest on
August 30, 1981. (ECF No. 21-5 at 2245-76.) Walton testified that
a broadcast went out on August 30, 1981, for a "blue-over-blue
Mercury with chrome wheels, white CB antenna, occupied by three
male blacks" related to the robbery and double murder at the L & G
Grocery. (Id. at 2246-47.)[16] Walton and his partner observed a
"blue-over-blue Mercury with chrome wheels and the white CB
antenna, occupied by three male blacks" on Danny Thomas Boulevard
and pulled into the parking lot behind them. (Id. at 2247) The
three men looked at the officers and exited the parking lot. (Id.)
The officers began following the vehicle and called for backup.
(Id. at 2247-48.) The car pulled into a private driveway on Georgia
Avenue. (Id. at 2248.)

---

[16]    Eddie Wright told police that the people responsible for the robbery
were driving a dark blue Mercury Marquis, and a Mercury Marquis registered to
Petitioner with "a half black vinyl top, over[ ]dark blue" was spotted in the
area. (ECF No. 44-1 at 3-4.)

The officers approached the car with their guns drawn and ordered the suspects to exit the vehicle and put their hands on the brick building near the car. (<u>Id.</u> at 2248-49.) McKay and Malone got out of the car and put their hands on the wall. (<u>Id.</u> at 2249, 2264.) Petitioner "gave [the officers] a little trouble." (<u>Id.</u> at 2249.) He said, "I haven't did anything, man . . . . I haven't did anything. What you want? What you want us to do?" (<u>Id.</u>) Walton grabbed Petitioner and put him on the wall. (<u>Id.</u>) Williams searched the suspects and found a loaded .45 caliber automatic pistol, cocked with one round in the chamber, on McKay. (<u>Id.</u> at 2249-50.) There was a .32 caliber revolver under the armrest of the car. (<u>Id.</u> at 2250.) Eight .45 caliber rounds, one hollow point .45 caliber round, and keys were found in the car. (<u>Id.</u> at 2256.)

### 6.   Non-Testifying Witnesses

Other witnesses to the L & G Grocery robbery who did not testify at the L & G Grocery trial include Percy Lee Jeffries, Jenny Jeffries, and Billy Ray Vaughn. (ECF No. 44-30 at 1-2.)

### 7.   Suspects in the L & G Grocery Robbery and Murders

James D. Coleman and Derrick Tolliver were, at one point, considered suspects in the L & G Grocery robbery and murders because they were involved in an armed robbery that occurred approximately five hours after the robbery and shootings at the L & G Grocery and approximately two miles away from the L & G Grocery. (ECF No. 44-30 at 5.) Charles Rice, <u>see</u> <u>supra</u> pp. 19-20, told police that Wilbur White (also known as "Big White") was in front of the L & G Grocery using a pay phone at the time the

robbery and murders occurred at the L & G Grocery. (See ECF No. 44-13 at 3; see also ECF No. 44-48 at 2 (" Q. Did you see anyone else outside the store? A. It was some man standing up there in the phone booth but I really don't know his name.").)

## V. RELEVANT CLAIMS

Petitioner seeks discovery to support the following <u>Brady</u>[17] and false testimony claims:

[A.]1.    The State withheld evidence that key State witness, Melvin Wallace, Jr., did not identify Michael Sample as the perpetrator prior to trial and, relatedly, the State knowingly put on false evidence at trial when it allowed Melvin Wallace to testify that he was "positive" about Michael Sample's identity. The State also withheld the fact that it pressured and/or cajoled and/or coached Melvin Wallace into testifying contrary to his initial statement to police . . . .

. . . .

[A.]2.    The State withheld material, exculpatory evidence demonstrating that Michael Sample was not the person who committed the offense. The State also had evidence that witnesses identified and named other suspects, these suspects included, but were not limited to: Sammy House, Wilbur White (aka Big White), Leeaster McKay, Jr. (aka Junebug, aka Leester McKay, Jr.), Marvin Phillips, James D. Coleman, Derrick Tolliver, Charles Malone, Ralph Franklin, and Tommy Lee Bradford). The exculpatory evidence includes, but is not limited to, the following:

. . . .

l.    Ralph Franklin, Larry McKay's cousin, was another suspect. The police knew that witness Melvin Wallace identified Ralph Franklin as one of the two perpetrators at a line-up immediately after the L & G offense. Larry McKay was the other perpetrator that Mr. Wallace identified that day. Conversely, Melvin Wallace did not select Michael Sample in a line-up that same day, despite the fact

---

[17]    <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

that Mr. Sample was an option. The State never
informed the defense despite the fact that
this evidence was highly exculpatory.
Similarly, Annie Low, owner of Low's grocery
identified Ralph Franklin and Larry McKay in a
line-up as responsible for the robbery at her
store on August 29, 1981 – just hours before
the incident at L & G.

m.  Tommy Lee Bradford was another suspect.
The State had information contained in the
Low's Robbery Supplementary Offense Report #2,
that a witness to the August 29, 1981 robbery
at Low's grocery identified an individual
named Tommy Lee Bradford as one of the two
perpetrators responsible for that robbery.
Given the fact that Low's grocery was robbed
mere hours before nearby L & G grocery and the
Low's robbery shared the same modus operandi
as the L & G incident, this information was
exculpatory.

.  .  .  .

[A.]3.  The State withheld material, exculpatory
information that the L & G Grocery was engaged in selling
drugs, which demonstrates that other persons had motives
to commit the offense and reflects adversely upon the
tenuous credibility of the State's witnesses associated
with L & G. The Memphis Police Department, Shelby County
Sheriff Department, and/or Federal Bureau of
Investigation and/or drug task force knew of the drug
dealing and the involvement of L & G.

.  .  .  .

[A.]4.  The State also withheld exculpatory evidence
relating to the testimony of Charles Rice, a 16-year-old
who had allegedly gone to the L & G grocery to buy beer
and cigarettes. Rice's testimony was false and the State
knowingly presented his false testimony. In fact, Charles
Rice later reported that he felt pressured to talk to
the police and cooperate. The State withheld from the defense
that it pressured and/or cajoled and/or coached Charles
Rice into testifying contrary to his initial statements
to police. This is supported by the fact that prior to
trial, Rice told police that he could really only see one
perpetrator, Larry McKay, and he couldn't really see
anything else because during the crime, he was standing
outside the store. This is also supported by the fact
that Melvin Wallace told police that before the shooting,

25

he noticed one other customer in the store – "a kid" – who left before the shooting started. . . .

. . . .

[A.]5.   The State had in its possession documents demonstrating that Charles Rice's identifications of Michael Sample at a line-up and at trial were misleading, inaccurate, and false . . . .

. . . .

[A.]6.   The State withheld material exculpatory evidence and/or permitted false testimony concerning the robbery at Lillie & Eddie's store on August 18, 1981. The State falsely alleged that Mr. Sample was involved in this earlier robbery, and then, at trial, relied upon that alleged involvement to claim that Mr. Sample was one of the offenders in the L & G offense. In particular, at trial, Eddie Wright, the owner of Lillie & Eddie's, testified that Michael Sample had indeed robbed his store. Tr. 2024. Mr. Sample was never convicted of the robbery that occurred at Lillie & Eddie's. The State permitted this testimony while having in its possession, material exculpatory evidence . . . .

. . . .

[A.]7.   The State withheld information from the defense that Lillie & Eddie's grocery was a well-known place to purchase illicit drugs, specifically preludes, quaaludes, and other pills. The Memphis Police Department, Shelby County Sheriff Department, and/or Federal Bureau of Investigation and/or drug task force knew of Lillie & Eddie's involvement in drug dealing. Eddie Wright and Grover Jones, of L & G grocery, knew of each other's illicit businesses. Eddie Wright sometimes hired a neighborhood person to work security armed with a gun at Lillie & Eddie's due to the high volume o[f] drugs and money inside. Members of the Memphis Police Department were known to frequent L & G's grocery in order to accept bribes in the form of cash and/or drugs in exchange for allowing the drug dealing enterprises at both L & G and Lillie & Eddie's to continue. The court can impute police officer knowledge of such bribes to the prosecution and thus, such evidence is considered *Brady* material. Arnold v. McNeil, 622 F. Supp. 2d 1294 (M.D. Fla. 2009), *aff'd* 595 F.3d 1324 (11th Cir. 2010) (habeas relief granted due to State's failure to disclose evidence of police officer's corruption, even though prosecutor did not have knowledge of corruption, because such evidence is considered *Brady* [evidence]).

26

. . . .

[A.]8.    The State also withheld evidence concerning
robberies on August 7, 1981 and August 29, 1981 at Low's
Grocery, both of which involved the same modus operandi
of the L & G incident, and which involved persons other
than Michael Sample. Moreover, the August 29, 1981
robbery at Low's occurred just hours before the incident
at L & G's grocery. . . .

. . . .

[A.]9.    The State withheld evidence of consideration
given to witnesses, such as failure to charge them with
criminal offenses, in exchange for their testimony
against Michael Sample at trial. Witnesses that received
consideration in exchange for their testimony included,
but are not limited to Grover Jones, Charles Rice, Willie
Everett, Gino White, Eddie Wright, and Mike Winfrey.

[A.]10.    Michael Sample incorporates all allegations in
paragraphs A.1-A.9. The prosecution presented false
testimony and withheld all of this exculpatory evidence
which, when considered cumulatively, were [pivotal] to
Petitioner's convictions and death sentences. The
subsequent state court denial of Mr. Sample's claims for
relief was contrary to and an unreasonable application of
clearly established federal law.

(ECF No. 11 at 7-30.)

Petitioner seeks discovery to support the following due

process claims:

[B.]1.    The trial court failed to sever Michael
Sample's case from Larry McKay's case where there was
obvious evidence of McKay's culpability and not Mr.
Sample's. This failure prejudiced Michael Sample because
the State imputed information, including witness
statements, about Larry McKay and the .45 caliber
automatic gun to Michael Sample, where Michael Sample did
not have anything to do with the .45 caliber automatic
gun and its use in the crime.

[B.]2.    The trial court violated Michael Sample's due
process rights and principles of fundamental fairness
when it allowed the State to introduce evidence of the
robbery at Lillie & Eddie's grocery where Mr. Sample did
not commit that robbery, where that robbery was only
potentially relevant to McKay's identity, and where

27

witnesses never identified Mr. Sample as involved in that robbery. This information was not only not relevant to Mr. Sample's guilt, it was not admissible for any other reason, even to prove identity.

[B.]3.     Relatedly, Michael Sample was prejudiced and his due process rights were violated by being required to [defend] against the robbery that occurred at Lillie & Eddie's when the State did not include that crime and the related offenses in the indictment.

(Id. at 30-31.)

Petitioner seeks discovery to support the following claims of

ineffective assistance of counsel related to the investigation and

preparation of his case:

[C.]2.     Stanley Fink and Mark Saripkin failed to assemble an adequate defense team to represent Mr. Sample. If Messrs. Fink and Saripkin had assembled an adequate defense team, there is a reasonable probability that the jury would not have convicted Michael Sample of felony murder and/or sentenced him to death. A defense team could have investigated and prepared the issues that were crucial to defending against the State's charges and convincing a jury that a punishment less than death was appropriate. It includes, but is not limited to, Stanley Fink and Mark Saripkin's:

    a.     Failure to interview and investigate critical witnesses from the incident at L & G grocery, the robbery at Lillie & Eddie's grocery, and the robberies at Low's store. Relatedly, failure to investigate other suspects that witnesses identified, including, but not limited to: Sammy House, Wilbur White (aka Big White), Leeaster McKay, Jr. (aka Junebug, aka Leester McKay, Jr.), Marvin Phillips, James D. Coleman, Derrick Tolliver, Charles Malone, Ralph Franklin, and Tommy Lee Bradfor[].

. . . .

[C.]5.     Michael Sample's attorneys failed to investigate the circumstances of Steve Jones and Benjamin Cooke's deaths, including, but not limited to collecting and evaluating ballistic and fingerprint evidence, taking photos of the crime scene, consulting with a crime scene

28

reconstructionist, a ballistic expert, a gang/urban sociology expert, a forensic pathologist, and [an] investigator devoted to guilt/innocence investigation. . . .

. . . .

[C.]6.   Michael Sample's attorneys failed to investigate the August 18, 1981 robbery at Lillie's & Eddie's store. Investigating that incident would have revealed that Mr. Sample was not responsible for that crime, that others were responsible for the robbery at Lillie & Eddie's, and that the other people responsible for the robbery at Lillie & Eddie's were likely responsible for the homicides and robbery at L & G.

. . . .

      c.   Had counsel investigated the crime at Lillie & Eddie's they also would have discovered that it was a well known location to purchase illicit drugs. Thus, others had motives to rob the grocery and counsel would have had information to impeach witnesses that testified against Mr. Sample at trial.

[C.]7.   Michael Sample's attorneys failed to investigate the August 7, 1981 and August 29, 1981 robberies that occurred at Low's grocery. Investigating those incidents would have revealed that Mr. Sample was not responsible for those crimes, that others were responsible, and that the other people responsible for the robberies at Low's were likely responsible for the homicides and robbery at L & G, particularly because the August 29, 1981 robbery at Low's occurred mere hours before the incident at L & G. . . .

(Id. at 32-38.)

    Petitioner seeks discovery to support the following claims of ineffective assistance of counsel related to his counsel's defense at the guilt-innocence stage of trial:

[D.]8.    Failure to challenge the State's presentation of evidence about the August 18, 1981 robbery at Lillie & Eddie's and highlight the fact that no one identified Michael Sample as the perpetrator for that crime. Moreover counsel failed to challenge the State's claim that only two people, Larry McKay and Michael Sample,

were involved in the robbery, when witnesses to that incident reported to the police that five black men were involved.

. . . .

[D.]11.   Michael Sample's attorneys failed to properly and effectively cross-examine the State's witnesses to demonstrate Mr. Sample's innocence, including ballistics, eyewitness identification, and other experts, including, but not limited to Dr. Charles Harlan, the medical expert.

[D.]12.   Michael Sample's attorneys failed to demand that the court determine State witness, Charles Rice's competency to testify and/or independently determine Rice's competency to understand what was transpiring in the courtroom.

(Id. at 43-45.)

Petitioner seeks discovery to support the following claims of

trial court error:

[G.]3.   In violation of Mr. Sample's due process rights, the trial court improperly denied Mr. Sample's motion for severance and tried Petitioner alongside co-defendant Larry McKay. Severance was necessary to preserve Mr. Sample's right to a fair and reliable trial and sentencing because there was clear evidence of Mr. McKay's guilt, not Mr. Sample's. . . .

. . . .

[G.]20.   The trial court improperly allowed witness Mike Winfrey to identify Mr. Sample in court (Tr. 2176) despite the fact that he had previously attended a preliminary hearing for the Eddie & Lillie's robbery and saw Mr. Sample in court (Tr. 2185). Thus, Mr. Winfrey's in-court identification of Mr. Sample did not reflect the fact that he recognized Mr. Sample as being involved in the Eddie & Lillie's robbery on August 18, 1981, it was based on the fact that he saw him in court in October 1981.

[G.]21.   The trial court improperly allowed witness Gino White to identify Mr. Sample in court (Tr. 2151) despite the fact that he had previously looked into the courtroom and observed Mr. Sample (Id.). Thus, Mr. White's in-court identification of Mr. Sample did not reflect the fact that he recognized him from being [involved] in the

30

robbery at Eddie & Lillie's on August 18, 1981, but it was based on the fact that Mr. White observed Mr. Sample [in court] immediately before testifying.

[G.]22.   The trial court failed to allow a competency evaluation of witness Charles Rice where his competency to testify was clearly at issue. Tr. 2187-91.

. . . .

[G.]26.   The trial court violated Mr. Sample's due process rights to a fair trial when it allowed evidence of the August 18, 1981 robbery of Lillie and Eddie's Grocery (1062 North Watkins) into the record at Mr. Sample's trial when such evidence was unduly inflammatory, irrelevant, and prejudicial and misleading about Mr. Sample's culpability for the L & G robbery. Moreover, Mr. Sample was never convicted of the Lillie & Eddie's robbery.

(Id. at 60-66.)

Petitioner seeks discovery to support the following claim of

prosecutorial misconduct:

[H.]2.   During the guilt-innocence phase of Michael Sample's trial the prosecution repeatedly misled the jury to believe that Michael Sample was involved in a prior unrelated robbery. Specifically, the prosecution improperly introduced evidence of the August 18, 1981 robbery at Lillie & Eddie's Grocery in order to prove guilt of first-degree murder in this case. The prosecution's introduction of the stolen gun from the prior robbery (Tr. 1967) and testimony from witnesses, including highly prejudicial details from the prior robbery (e.g. Tr. 2012 et seq., 2022; 2082 et seq; 2171 et seq.) unduly prejudiced Michael Sample. Moreover, the introduction of such evidence resulted in an unreliable identification of Michael Sample and violated his due process rights, especially where the prosecution stated that they wanted to present evidence to prove identity.

(Id. at 68.)

Petitioner seeks discovery to support his claim of actual

innocence:

[K.]14.   Michael Sample's death sentence is unconstitutional because he is actually innocent of the crimes for which he was convicted.

31

(<u>Id.</u> at 83.)

# VI. STANDARD

Habeas petitioners do not have an automatic right to discovery. <u>See</u> <u>Johnson v. Mitchell</u>, 585 F.3d 923, 934 (6th Cir. 2009) (quoting <u>Stanford v. Parker</u>, 266 F.3d 442, 460 (6th Cir. 2001)). Discovery in habeas cases is controlled by Rule 6(a) of the Rules Governing Section 2254 Cases in the United States District Courts ("Habeas Rules"), which states: "A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery." <u>See</u> <u>Cornwell v. Bradshaw</u>, 559 F.3d 398, 410 (6th Cir. 2009) ("For good cause shown, the district court has the discretion to permit discovery in a *habeas* proceeding . . . ."). Habeas Rule 6 is meant to be "consistent" with the Supreme Court's decision in <u>Harris v. Nelson</u>, 394 U.S. 286 (1969). <u>Bracy v. Gramley</u>, 520 U.S. 899, 909 (1997). In <u>Harris</u>, the Court stated:

> [W]here specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry.

<u>Harris</u>, 394 U.S. at 300.

"Good cause" is not demonstrated by "bald assertions" or "conclusory allegations." <u>Stanford</u>, 266 F.3d at 460; <u>see also</u> <u>Williams v. Bagley</u>, 380 F.3d 932, 974 (6th Cir. 2004). Rather, the requested discovery must be materially related to claims raised in the habeas petition and likely to "resolve any factual disputes that could entitle [the petitioner] to relief." <u>Williams</u>, 380 F.3d

32

at 975 (quoting <u>Stanford</u>, 266 F.3d at 460) (internal quotation marks omitted); <u>see</u> <u>Bracy</u>, 520 U.S. at 908-09 (allowing discovery relevant to "specific allegations" of fact in support of a claim of constitutional error); <u>Post v. Bradshaw</u>, 621 F.3d 406, 425 (6th Cir. 2010) (stating that discovery provides petitioner "that extra evidence he [] needs to prove or strengthen his case"); <u>Braden v. Bagley</u>, No. 2:04-CV-842, 2007 WL 1026454, at *2 (S.D. Ohio Mar. 30, 2007) ("Rule 6's 'good cause' standard requires petitioner to at least attempt to identify what he expects to uncover through his discovery requests.").[18] Although "more liberal discovery is appropriate in capital [habeas] cases," <u>Payne v. Bell</u>, 89 F. Supp. 2d 967, 971 (W.D. Tenn. 2000) (citing <u>Lockett v. Ohio</u>, 438 U.S. 586, 604 (1978)), Rule 6(a) does not permit a "fishing expedition masquerading as discovery," <u>Stanford</u>, 266 F.3d at 460.

Having determined the applicable standards related to Petitioner's discovery request, the Court will address the following discovery issues raised by the State: (1) whether Petitioner is entitled to discovery on claims not exhausted in state court because those claims are procedurally defaulted; (2) whether Petitioner is entitled to discovery of information that

---

[18]    "The Sixth Circuit has not determined whether § 2254(e)(2) applies to motions for discovery." <u>Hill v. Anderson</u>, 4:96CV0795, 2010 WL 5178699, at *8 (N.D. Ohio Dec. 14, 2010). A petitioner may show good cause under Habeas Rule 6 without meeting the higher standard for an evidentiary hearing in 28 U.S.C. § 2254(e)(2). <u>Payne v. Bell</u>, 89 F. Supp. 2d 967, 970 (W.D. Tenn. 2000); <u>see</u> <u>Braden</u>, 2007 WL 1026454, at *6 (distinguishing discovery from factual development under § 2254(e)(2)); <u>see also</u> <u>Simmons v. Simpson</u>, No. 3:07-CV-313-S, 2009 WL 4927679, at *5-6 (W.D. Ky. Feb. 12, 2009) (stating that this view is not unanimously held by all federal courts).

would not have impacted the jury's verdict; (3) whether Pinholster[19] bars discovery on those claims that were adjudicated on the merits by the state court.

## A.   Discovery Related to Procedurally Defaulted Claims

Respondent argues that certain claims were not presented to the highest available state court. As a result, Petitioner is not entitled to discovery because those claims are procedurally defaulted and Petitioner did not exercise due diligence to obtain the factual predicate for these claims under 28 U.S.C. § 2254(e)(2). (See ECF No. 46 at 7-9, 12-15, 18-19, 22, 24, 27-29, 34, 36, 39-42, 45, 48-49, 52-54, 56-57, 59-69, 71.)

There is no clear entitlement to discovery in support of procedurally defaulted habeas claims. See Williams, 380 F.3d at 975-76 (finding no error in district court's denial of discovery on procedurally defaulted ineffective assistance of counsel claims); Royal v. Taylor, 188 F.3d 239, 249 (4th Cir. 1999) (finding no error in district court's denial of discovery on procedurally defaulted due process claims); Calderon v. U.S. Dist. Court for the N. Dist. of Ca., 98 F.3d 1102, 1106 (9th Cir. 1996) (issuing mandamus to prevent discovery awarded by district court because petitioner had not filed a habeas petition with exhausted claims or sought such discovery in the state court); Sherman v. McDaniel, 333 F. Supp. 2d 960, 969-70 (D. Nev. 2004) (denying discovery on unexhausted claims because "[t]o do so would tend to undermine the exhaustion requirement, and the doctrine of federal-state comity on

---

[19]   Cullen v. Pinholster, 131 S. Ct. 1388 (2011).

which it rests"). But see Conway v. Houk, No. 3:07-cv-345, 2009 WL 961199, at *3 (S.D. Ohio Apr. 8, 2009) ("So long as the procedural default defense has not been adjudicated, its pleading does not provide a basis to deny discovery."); Hutton v. Mitchell, No. 1:05-CV-2391, 2008 WL 4283318, at *2 (N.D. Ohio Sept. 16, 2008) (noting that allegations of procedural default will not automatically bar discovery). However, "a habeas petitioner may use a Habeas Rule 6 discovery motion to obtain evidence relevant to excusing procedural default." Payne, 89 F. Supp. 2d at 974 (granting discovery motion in support of a presumptively defaulted claim because the motion sought to discover evidence which would allow the petitioner to obtain a factual basis to excuse default, his "actual innocence"); see Braden, 2007 WL 1026454, at *10 (granting the deposition of a mitigation specialist where the request was reasonably calculated to lead to evidence that could demonstrate a justification for excusing the apparent default of the petitioner's claim).

Since procedural default does not automatically bar discovery in habeas cases, discovery is allowed in this case if it would lead to evidence that could excuse the apparent procedural default of Petitioner's claims.

**B.   Impact on Jury Verdict**

Respondent argues that Petitioner is not entitled to discovery if the information requested would not have an impact on the jury's verdict pursuant to 28 U.S.C. § 2254(e)(2)(B). (See ECF No. 46 at

7-9, 13-14, 16, 20, 23-24, 26-27, 29, 33, 35-36, 43, 46, 50, 53-54, 56, 58-59, 61-62, 64-66, 68, 70, 72.)

As stated above "good cause" is the appropriate standard for Habeas Rule 6 discovery. The good cause standard is satisfied if Petitioner is able to demonstrate that he may be entitled to relief if the facts are fully developed, in other words, if the requested discovery could yield evidence establishing a constitutional violation, and if the requested information would resolve a factual dispute that could entitle Petitioner to relief. See Williams, 380 F.3d at 976. Petitioner does not have to demonstrate that the requested discovery would impact the verdict.

**C.   Pinholster**

Respondent contends that Pinholster bars the grant of discovery for Petitioner's claims that were adjudicated on the merits by the state court because habeas review is limited to the record before the state court. (ECF No. 46 at 1-2, 6, 12, 32, 35-36, 39, 48, 55, 60, 63, 68-71.) As a result, discovery would be futile because the Court would be unable to use any new evidence in conducting § 2254 habeas review. (Id. at 2.)

In Pinholster, the Supreme Court held that 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), limits § 2254 habeas review to the "record that was before the state court that adjudicated the claim on the merits." 131 S. Ct. 1388, 1398 (2011). In so holding, the Supreme Court stated that "[s]ection 2254(e) continues to have force" and that

36

"state prisoners may sometimes submit new evidence in federal court." Id. at 1401.[20]

Petitioner argues that Pinholster does not apply to the discovery requests because the State withheld evidence during the state court proceedings, and discovery was not previously available to Petitioner. (ECF No. 48 at 9.) He asserts that a Pinholster bar on discovery would mean that the State could thwart any adjudication of facts underlying a federal claim simply by withholding the facts during the state-court proceedings. (Id. at 10.) Petitioner further contends that any new evidence discovered would represent a new Brady claim. (Id.) Petitioner emphasizes the importance of a cumulative review of evidence for Brady and false testimony claims and argues that the state court has not conducted a cumulative review in Petitioner's case. (Id. at 12.) He contends that the Court should grant discovery and consider all evidence on de novo review. (Id. at 12-13.)

The Court agrees with Petitioner for the following two reasons.  First, Pinholster "did not, strictly speaking, alter or even speak to the standards governing [Rule 6] discovery." Conway v. Houk, No. 2:07-cv-947, 2011 WL 2119373, at *3 (S.D. Ohio May 26, 2011). Given the lack of direct guidance from the Supreme Court or the Sixth Circuit on the breadth of Pinholster, see Williams v. Houk, No. 4:06-cv-451, 2012 WL 6607008, at *4 (N.D. Ohio Dec. 18,

---

[20]     The Supreme Court also noted that "Justice Sotomayor's hypothetical involving new evidence of withheld exculpatory witness statements, may well present a new claim."  Id. at 1401 n.10.

2012), the Court will follow the plain language of Pinholster and limit its force to § 2254 habeas review.

Second, Pinholster's restrictions should not be invoked at the discovery phase where the petitioner is seeking discovery related to potential Brady violations. See Jones v. Bagley, 696 F.3d 475, 486 n.4 (6th Cir. 2012) (stating that if Petitioner could establish a Brady violation with the introduction of new evidence discovered in the federal habeas proceedings, introduction of that evidence would not violate Pinholster); see also Pinholster, 131 S. Ct. At 1401 n.10; 28 U.S.C. § 2254(e)(2)(A)(ii). The Court agrees with Petitioner that allowing a Pinholster bar on discovery would mean that the State could thwart any adjudication of facts underlying a federal claim simply by withholding the facts during the state-court proceedings.

## VII. ANALYSIS

The Court will address Petitioner's specific discovery requests ("Requests A–I") in turn.

### A. DA & MPD Records ("Request A")

Petitioner seeks discovery of "all records from the Shelby County District Attorney General's Office [("DA")] and the Memphis Police Department [("MPD")] concerning the investigation, prosecution, and post-conviction proceedings arising from the [L & G Grocery robbery and murders] (1069 North Watkins in Memphis, Tennessee 38107) on August 29, 1981," including but not limited to

1.   Complete [DA] and [MPD] files;

2.   [A]ny investigation conducted on Leeaster McKay, Jr., including any statements taken from him;

38

3.   [A]ny investigation conducted on Ralph Franklin, including any statements taken from him;

4.   [A]ny investigative and forensic information regarding the fingerprints that the MPD collected at the crime scene, including comparisons and results from those comparisons; and

5.   [T]he names and photographs that correspond to the Bureau of Investigation numbers in the book of photos that the MPD showed to Melvin Wallace at Baptist Hospital on August 30, 1981.

(ECF No. 43 at 1-2; ECF No. 44 at 8-9.)

Petitioner argues that he has good cause for discovery of the complete DA and MPD files for the investigation, prosecution, and post-conviction proceedings related to the August 29, 1981, L & G Grocery robbery and murders because these records are relevant to his Brady claims (see Am. Pet. Claims A.1-10, ECF No. 11, at 7-30) and false testimony claims (see Am. Pet. Claims A.1, A.4-6, A.10, ECF No. 11, at 7, 21-27, 30). (ECF No. 44 at 5-6, 8.)

Petitioner asserts that his efforts to obtain this discovery without a court order were unsuccessful. (Id. at 6.) He contends that these records will assist him in proving Claim A.2, that the State withheld evidence demonstrating that Petitioner was not the person who committed the offense and that the State had evidence that its witnesses identified and named other suspects. (Id. at 6-7; see ECF No. 11 at 14-19.) Petitioner points to Grover Jones' statement that the only person he knew who fit the description of the perpetrator was "Junebug"; the fact that Charles Malone informed police that "Junebug" was McKay's brother; and Wallace's identification of Ralph Franklin, McKay's cousin, in a lineup two

days after the murders when Petitioner was also in the lineup. (ECF No. 44 at 6-7.) Petitioner argues that the MPD and DA have additional information about the "identification procedures" they employed and the State's investigation of other suspects based on the facts that Jones and Wallace could not identify Petitioner immediately after the crime and both identified someone other than Petitioner. (Id. at 7.)

Petitioner argues that the requested records will assist Petitioner in proving that the State knowingly presented false testimony (see Am. Pet. Claims A.1, A.4-6, A.10, ECF No. 11, at 7, 21-26, 30) regarding witness identification of Petitioner. (ECF No. 44 at 7.) He points to Wallace's confusing testimony at trial that he saw Petitioner "face-to-face" and could identify him, despite Wallace's failure to identify anyone at the hospital just after the incident and to identify Petitioner in a lineup. (Id. at 7-8.) Petitioner points to a police report noting that Wallace stated "he had really only seen one of the male blacks and that was the one that bent over him and shot at his head with a .45 automatic. This would have been Larry McKay." (Id. at 7; see ECF No. 44-1 at 8.) Petitioner notes that Wallace did not make a positive identification of Petitioner until a probable-cause hearing held two months after the shooting, and Wallace explained that he knew Petitioner's name from reading it in the paper. (ECF No. 44 at 7; ECF No. 44-15 at 4.) Petitioner contends that the requested information supports his claim that Wallace did not testify

40

truthfully at trial about Petitioner being one of the perpetrators. (ECF No. 44 at 8.)

Petitioner also notes that his fingerprints did not match fingerprints lifted at the crime scene. (Id. at 8.) He argues that he has good cause to obtain files indicating what fingerprint matches were made. (Id.) Petitioner argues that the requested discovery will support both his Brady claim and his actual-innocence claim. (Id.)

Respondent argues that Petitioner's assertion that he has been unable to obtain discovery absent a court order is false. Petitioner possesses a substantial number of records related to his claims as evidenced by the attachments to his Motion for Discovery. (ECF No. 46 at 5.) Respondent asserts that absent a court order, there is no obligation under the Tennessee Post-Conviction Procedure Act to provide investigative records to Petitioner while a collateral review is pending. (Id. at 5 n.5.)

Respondent argues that Petitioner has not demonstrated good cause. (Id. at 5-6.) He contends that the Tennessee Court of Criminal Appeals deemed the materials Petitioner offers to challenge the veracity of Wallace's in-court identification as immaterial and insufficient to support a Brady claim. (Id. at 6, 8.) Respondent argues that Wallace's in-court identification was cumulative evidence because Rice identified Petitioner and that further impeachment of Wallace's testimony would have no impact on the jury verdict. (Id. at 6-7.) Respondent argues that Petitioner's attachments and allegations about Grover Jones' and Malone's

41

statement about "Junebug" were never presented to the highest
available state court and are, therefore, procedurally defaulted.
(Id. at 7.) Respondent notes that Petitioner does not indicate when
he discovered Malone's statement to police identifying "Junebug" as
Leeaster McKay, Jr. (Id.) Respondent points out that Jones was not
an eyewitness, and Jones' speculation about the identity of the
perpetrators carried little weight with the jury. (Id.) Respondent
asserts that Jones' and Malone's statements are not indicative of
improperly withheld evidence and would not entitle Petitioner to
habeas relief. (Id. at 7-8.)

Respondent argues that Petitioner's attachments and
allegations about the MPD fingerprint records were never presented
to the highest available state court and as a result are
procedurally defaulted. (Id. at 8.) Respondent asserts that
Petitioner possessed these records when he filed his petition for
post-conviction relief on January 27, 1995, but Petitioner failed
to present the records to the Tennessee Court of Criminal Appeals
as a basis for relief in 2009. (Id. at 9.) Respondent contends that
the lack of fingerprint records implicating Petitioner's presence
at the crime scene, a place frequented by the public, has a
negligible effect on the jury's verdict in light of the
identification testimony presented at trial. (Id.)

Respondent characterizes Petitioner's argument for discovery
as a propensity argument: that because previous post-conviction
discovery resulted in relevant evidence, the current requests
should be granted. (Id.) Respondent contends that generalized

42

statements about the speculative existence of evidence do not constitute good cause, and Petitioner has failed to produce specific evidence that supports his discovery requests and to identify specific information that his requests will uncover. (<u>Id.</u> at 9-10.) Respondent asserts that "[P]etitioner's request represents a quintessential example of an unauthorized 'fishing expedition.'" (<u>Id.</u> at 10.)

Petitioner argues that <u>Brady</u> constitutes sufficient cause to excuse procedural default. (ECF No. 48 at 3-4.) He asserts that <u>Martinez</u>[21] establishes cause for the procedural default of his <u>Brady</u>, <u>Napue</u>[22], <u>Giglio</u>[23], and ineffective assistance of counsel claims. (<u>Id.</u> at 4-6.) Petitioner argues that evidence of consideration given to witnesses is generally found in the DA file, and the only means for Petitioner to obtain <u>Brady</u> materials is through the DA's willing compliance with <u>Brady</u>, voluntary disclosure of the DA file, or a motion for discovery. (<u>Id.</u> at 8.) Petitioner asserts his claim of actual innocence as sufficient cause to overcome procedural default. (<u>Id.</u> at 10-11.)

Respondent argues that <u>Martinez</u> does not apply in Tennessee based on the United States Court of Appeals for the Sixth Circuit's recent ruling in <u>Hodges v. Colson</u>, 711 F.3d 589, 612 (6th Cir. 2013). Respondent argues that the requested discovery related to Petitioner's procedurally defaulted claim is not likely to resolve

---

[21]    <u>Martinez v. Ryan</u>, 132 S. Ct. 1309 (2012).

[22]    <u>Napue v. Illinois</u>, 360 U.S. 264 (1959).

[23]    <u>Giglio v. United States</u>, 405 U.S. 150 (1972).

any factual disputes that would entitle Petitioner to relief and therefore should be denied. (ECF No. 56 at 2.)

MPD and DA records related to the robbery and murders at the L & G Grocery may provide information that resolves factual disputes about eyewitness identification and other suspects, and may support Petitioner's <u>Brady</u> claims. The suppression of any such material evidence would excuse the procedural default of a claim. <u>See Jones</u>, 696 F.3d at 486-87 ("[S]howing an actual *Brady* violation is itself sufficient to show cause and prejudice."). Accordingly, the Sixth Circuit's decision in <u>Hodges</u> does not impact the discovery of these records.[24]

The Court finds that Petitioner has demonstrated good cause for discovery of the MPD and DA records related to the L & G Grocery robbery and murders, including Petitioner's itemized requests to the extent that these requests are limited to the L & G Grocery incident.[25] Request A is GRANTED.

---

[24]    Petitioner, in his Notice of Supplemental Authority requests that the Court conclude that <u>Martinez</u> applies in this case based on the Court's recent decision in <u>Cone v. Colson</u>, No. 97-2312, 2013 WL 752129 (W.D. Tenn. Feb. 14, 2013). For the same reasons listed above, the Court declines to reach the issue of whether <u>Martinez</u> applies in this case.

[25]    Discovery of the DA's case file is little more than a formality given the fact that Petitioner was at one time entitled to obtain a copy of the files pursuant to the Tennessee Public Records Act, Tenn. Code Ann. § 10-7-503, <u>et seq.</u> <u>See Capital Case Res. Ctr. of Tenn., Inc. v. Woodall</u>, No. 01-A-019104CH00150, 1992 WL 12217 (Tenn. Ct. App. Jan. 29, 1992) (holding that the District Attorney General could not deny a request for access to the prosecution and police files on a rape/murder case by attorneys representing the person convicted of the crimes in a pending habeas corpus proceeding in federal court because those files were not exempt from disclosure under the Tennessee Public Records Act).

**B.    Charles Rice ("Request B")**

Petitioner seeks discovery of "Charles Rice's school records and Juvenile Court records, the [DA and MPD] files regarding evidence of consideration that the State gave to Charles Rice in exchange for his testimony, and the deposition of Charles Rice," including but not limited to

1.    Charles Rice's school records from the Memphis City School system ([Chicago Park and Klondike elementary schools, an alternative junior high school, and Manassas High School]);

2.    Rice's entire Juvenile Court record from 1973-82;

3.    [T]he transcript of the proceedings of Charles Rice's Juvenile Court charges stemming from the February 11, 1982 incident, including discussion of the March 30, 1982 disposition;

4.    [T]he [DA and/or MPD] files related to Rice's Juvenile Court charges, especially the February 11, 1982 incident, to see how his being a witness against Mr. Sample affected his charges; . . .

5.    Rice's Juvenile Court probation files, especially [those] relating to the February 11, 1982 incident;

6.    Charles Rice's mental health evaluation conducted by the Juvenile Court; and

7.    [P]ermission to depose Charles Rice.

(ECF No. 43 at 2-3; ECF No. 44 at 14.)

Petitioner argues that Rice was the State's star witness who testified that he observed Petitioner and McKay inside the store immediately prior to the robbery and that he saw Petitioner and McKay shoot and kill the store clerks. (ECF No. 44 at 9.) Petitioner argues that Rice, who was sixteen years old at the time of the crime, could not identify Petitioner without police

45

prodding, lied while testifying, and received consideration from the State for his false testimony. (Id.)

1.   **School Records ("Request B1")**

Petitioner asserts that he has good cause for Rice's school records because they will show that Rice lied about his intellectual abilities and mental health and misled the trial court into believing that Rice was competent to testify. (Id.) Petitioner contends that the State knew that Rice was mentally retarded and lacked basic reasoning skills. (Id.) Petitioner argues that Rice's school records will enable Petitioner to prove that the State knowingly presented false testimony (Am. Pet. Claim A.4, ECF No. 11, at 21-23), that Petitioner's trial counsel were unconstitutionally ineffective for failing to challenge Rice's testimony (Am. Pet. Claims D.11-12, ECF No. 11, at 45), and that the trial court failed to conduct an adequate competency evaluation (Am. Pet. Claim G.22, ECF No. 11, at 65). (ECF No. 44 at 9-10.)

At trial, defense counsel raised the issue of Rice's competency to testify. (Id. at 10.) Rice testified that he was promoted each year, never failed a grade, did not take special classes, and had not had a mental evaluation. (Id.) However, a neuropsychological evaluation performed by Dr. Pam Auble reveals that Rice clearly lied about his educational history. (Id. at 10-11; see ECF No. 44-18 at 8.) Rice failed four grades and finally left school after three attempts at eighth grade. (ECF No. 44 at 10; ECF No. 44-18 at 3-5, 24-25.) Rice received special education services and his IQ in third grade was in the range for mental

retardation. (ECF No. 44 at 11; ECF No. 44-18 at 4.) Petitioner argues that a subsequent evaluation by Dr. Gregory DeClue noted similar intellectual deficiencies indicating that Rice lied while testifying against Petitioner and showed suggestibility and vulnerability to police pressure. (ECF No. 44 at 11.) Petitioner relies on Majors v. Warden, No. 2:99-cv-00493, 2010 WL 3341593, at *2-3 (E.D. Cal. Aug. 23, 2010), which granted the petitioner leave to subpoena the mental health records of the state's key witness because the records supported false testimony, Brady, and ineffective assistance of counsel claims. (Id.)

Respondent notes that the Tennessee Court of Criminal Appeals considered and rejected Petitioner's claims that the State knowingly presented false testimony from Rice. (ECF No. 46 at 12.) Respondent cites the Tennessee Court of Criminal Appeals' decision which noted that Rice was extensively cross-examined and impeached when the defense highlighted that Rice had lied to police. (Id. at 13 (citing Sample, 2010 WL 2384833, at *20).) Respondent argues that considering Wallace's testimony, Rice's testimony was merely cumulative evidence of Petitioner's guilt. (Id.)

Petitioner seeks to establish that the State knew Rice was mentally retarded, lacked basic reasoning, and fell victim to police suggestibility. (See ECF No. 44 at 9.) However, even the mentally incompetent can testify if they have personal knowledge of the subject of their testimony and swear or affirm to tell the truth. See Tenn. R. Evid. 601 Advisory Commission's Comments; see also Tenn. R. Evid. 602 & 603. Although school records may reveal

47

that Rice testified untruthfully about the grades he completed and whether he attended special education classes, Rice's testimony about his education is collateral to Rice's testimony concerning substantive matters affecting Petitioner's guilt or innocence. See United States v. Rovetuso, 768 F.2d 809, 818 (7th Cir. 1985) (finding no error where the untruthful testimony concerns collateral matters, including the witness' background and education). School records are not likely to demonstrate whether Rice was truthful about the specific matters at issue in Petitioner's trial or whether he was subject to police suggestion.

The Court finds that Petitioner has not demonstrated good cause for the discovery of Rice's school records. Request B1 is DENIED.

### 2.   Juvenile Records ("Requests B2-B6")

Petitioner argues that he has good cause to obtain discovery of evidence of consideration that the DA and/or MPD gave to Rice in exchange for his testimony to support Petitioner's claims that the State withheld evidence of the consideration it gave Rice (Am. Pet. Claim A.9, ECF No. 11, at 30); that the State knowingly put on Rice's false testimony (Am. Pet. Claims A.4 & A.5, id., at 21-25); and that Petitioner's counsel were ineffective when they failed to challenge Rice's testimony (Am. Pet. Claim D.11, id., at 45). (ECF No. 44 at 12.) Petitioner asserts that on February 11, 1982, Rice was charged with "aggravated assault and extortion" related to an incident involving his girlfriend where Rice allegedly pushed her down the stairs and took her money. (ECF No. 44 at 12; ECF No. 44-

48

18 at 7.) On March 8, 1982, Rice testified at a hearing on a motion to suppress identification evidence in Petitioner's case. (ECF No. 44 at 12.) On March 30, 1982, the charges against Rice were changed to assault and battery, and Rice was placed on probation and released to the custody of his mother. (Id.; ECF No. 44-18 at 7.) Petitioner argues that the State appears to have given Rice a lenient sentence in exchange for his testimony at Petitioner's trial and withheld this information from the defense. (ECF No. 44 at 12-13.)

Respondent asserts that "[o]ther than the bald and conclusory allegation" that Rice received a contemporaneous charge reduction in juvenile court, Petitioner offers no facts to support his claim that Rice received consideration in exchange for his testimony. (ECF No. 46 at 14.) Respondent points to the cumulative nature of Rice's testimony and the Tennessee Court of Criminal Appeals' determination that Rice was extensively cross-examined and impeached to assert that the requested records would not entitle Petitioner to habeas relief. (Id.)

Petitioner has presented nothing more than mere speculation that the State gave Rice a lenient sentence in exchange for his testimony in Petitioner's case. Without further information establishing a connection between Rice's testimony and his juvenile court records, the Court finds that Petitioner has not demonstrated

good cause for discovery of Rice's juvenile court records.[26] Requests B2-B5 are DENIED.

Petitioner asserts that psychological evaluations underscore Rice's competency issues and call into question his ability to witness an event and subsequently testify about it. (ECF No. 44 at 12.) Dr. Angelillo interviewed Rice in 2001, about nineteen years after Petitioner's trial when Rice was facing first-degree murder charges, and reported that Rice could become "irrational, delusional, . . . when his dependence on others was threatened." (ECF No. 44-18 at 14; see ECF No. 44-22 at 3-5.) These records in no way indicate that, at the time of Petitioner's trial, Rice was an incompetent witness or that juvenile court psychiatric records could resolve the issue of Rice's competency or his truthfulness as it relates to the L & G Grocery robbery and murders.

The Court finds that Petitioner has not demonstrated good cause for the discovery of the mental-health evaluation of Rice that the juvenile court conducted. (See ECF No. 44-18.) Request B6 is DENIED.

### 3. Deposition of Charles Rice ("Request B7")

Petitioner argues that he has good cause to take Rice's deposition to develop his ineffective assistance of counsel claims (Am. Pet. Claims C.2, D.11-12, ECF No. 11, at 32-33, 45) and his claim that the trial court violated his rights when it failed to

---

[26] Petitioner should be able to determine from the MPD and/or DA files whether the State made a deal with Rice. If Petitioner finds additional information in the MPD and/or DA files supporting his claim that the State gave Rice a lenient sentence in exchange for his testimony in Petitioner's case, Petitioner may file a motion for discovery of those records at that time.

conduct an adequate competency evaluation of Rice (Am. Pet. Claim G.22, ECF No. 11, at 65). (ECF No. 44 at 13.)

Petitioner contends that Rice's drug and alcohol use, beginning at age eleven, affected his ability to witness the incident, recall the incident, and subsequently testify. (Id.) Petitioner points out that Rice "continues to appear to be suffering from significant *psychological disturbances* . . . he manifests symptoms of *delusional disorder*. . . ." (Id. at 13-14.) Petitioner argues that the evaluation's findings underscore Rice's competency issues and call into question Rice's ability to witness an event and subsequently testify about it. (Id. at 14.) Petitioner asserts that "it is imperative" for his counsel to depose Rice to establish what he actually saw, the extent of his drug use, his lack of perception, and his mental abilities so that Petitioner can prove his claims. (Id.) Petitioner contends that a deposition would allow him to explore the circumstances under which Rice gave statements, received consideration, and/or was involved with the prosecution in preparing his testimony. (Id.)

Respondent argues that the claims related to Rice's competency were never presented to the highest available state court and, as a result, are procedurally defaulted. (ECF No. 46 at 15.) Respondent argues that Petitioner could have deposed or subpoenaed Rice during the state post-conviction proceedings. (Id.) He further asserts that because Petitioner's counsel had the opportunity to cross-examine Rice, the need for a discovery deposition is mitigated. (Id.) Respondent asserts that Petitioner has failed to

demonstrate that a deposition would result in the discovery of evidence entitling Petitioner to relief. (Id. at 16.)

Petitioner focuses on obtaining information about Rice's lack of perception, drug use, and mental abilities and whether Petitioner received consideration for his testimony. (ECF No. 44 at 14.) For the competency, false testimony, and ineffective assistance issues, the focus should be on whether Rice told the truth at Petitioner's trial. Petitioner has not presented any specific facts to demonstrate that Rice was inebriated or under the influence at the time he witnessed the L & G Grocery robbery or when he testified at Petitioner's trial. Petitioner has not presented any facts indicating that Rice was untruthful about anything other than the collateral matter of his own educational background. Petitioner has not presented facts indicating that Rice was delusional at the time of Petitioner's trial. Petitioner only speculates that Rice received consideration in exchange for his testimony. Further, Petitioner's counsel was able to cross-examine Rice at trial, mitigating the need for a discovery deposition. See Payne, 89 F. Supp. 2d at 974.[27]

The Court finds that Petitioner has not demonstrated good cause to take Rice's deposition. Request B7 is DENIED.

---

[27]    Petitioner contends that Rice was incompetent to testify and notes Rice's psychiatric issues to demonstrate that he was incompetent to testify. (See ECF No. 44 at 14.) It would seem that Rice's testimony, if he is indeed incompetent as Petitioner argues, would not be reliable to support Petitioner's false testimony, ineffective assistance of counsel, and Brady claims.

**C.   Alibi Evidence for the L & G Grocery Robbery and Murders, the Lillie & Eddie's Robbery, and the Low's Robberies ("Request C")**

Petitioner requests leave to depose "C.G. Mannon, former DA investigator, and Mary Bell, former personnel clerk at Carrier Corporation," and seeks discovery of Petitioner's "timecards for the month of August 1981, particularly August 7, 18, and 29, 1981." (ECF No. 43 at 3.)

Petitioner argues that he has good cause to depose Mannon and Bell and to obtain Petitioner's time cards for the month of August 1981 from Carrier to support his false testimony, <u>Brady</u>, ineffective assistance of counsel, prosecutorial misconduct, and trial court error claims related to the Lillie & Eddie's Grocery robbery (Am. Pet. Claims A.6, C.6, G.26, H.2, ECF No. 11, at 25-26, 36-37, 66, 68), and his claims of actual innocence (Am. Pet. Claims A.2, K.14, ECF No. 11, at 14-19, 83). (ECF No. 44 at 15.)

Petitioner contends that he was working his regular shift at Carrier Air Conditioning Factory ("Carrier") in Collierville, Tennessee, from 4:00 p.m. until midnight on August 18, 1981, when Lillie & Eddie's Grocery was robbed at 9:35 p.m. (<u>Id.</u>) He contends that the State knew he was at work and still put on evidence placing him at the Lillie & Eddie's Grocery robbery in order to implicate him in the L & G Grocery robbery and murders. (<u>Id.</u>) Petitioner contends that Mannon uncovered exculpatory facts while investigating the case including: (1) information from Petitioner's neighbor Osborne Lumpkin that Petitioner worked from "around 4:00 in the evening [to] 1:00 o'clock at night"; and (2) information

from Bell at Carrier that, on August 18, 1981, Petitioner's time
card showed that he worked double shifts from 7:00 a.m. to 3:30
p.m., and 4:00 p.m. to 12:00 p.m. (<u>Id.</u> at 15-17; <u>see</u> ECF No. 44-23;
ECF No. 44-24.) Petitioner argues that he has good cause to obtain
his time cards for the month of August 1981, and specifically the
time cards for August 7, 18, and 29, 1981. (ECF No. 44 at 17.) The
Low's Grocery robberies occurred on August 7 and 29, 1981, the
Lillie & Eddie's Grocery robbery occurred on August 18, 1981, and
the L & G Grocery robbery and murders occurred on August 29, 1981.
(<u>Id.</u>) Petitioner argues that the Court should permit Petitioner to
issue a Rule 45 subpoena to Larry J. Campbell, the Senior Human
Resource Manager for Carrier's parent company, to obtain the time
cards. (<u>Id.</u>)

Respondent argues that while the Amended Petition states that
the State withheld material exculpatory evidence about the robbery
at Lillie & Eddie's Grocery, it does not state that Petitioner was
at work during the robbery. (ECF No. 46 at 17; <u>see</u> ECF No. 11 at
25-26.) Respondent argues that Habeas Rule 2(c) provides that a
petitioner must "specify all the grounds for relief available" and
"state the facts supporting each ground." (ECF No. 46 at 17.)
Respondent asserts that the discovery sought supports an allegation
that was not pleaded and that Petitioner has failed to demonstrate
good cause. (<u>Id.</u> at 18.) Respondent points to Petitioner's "obvious
knowledge of his own whereabouts on the time and date in question"
and the fact that Petitioner never presented this allegation to the
highest available state court. (<u>Id.</u>) Respondent further notes that

Petitioner could have deposed or subpoenaed Mannon, Bell, or Campbell during state post-conviction proceedings. (Id.) Respondent argues that Brady is not violated by failure to disclose information or records that are readily available to the defense. (Id. at 19.) Respondent also argues that such evidence does little to refute Wallace's and Rice's identification of Petitioner as a perpetrator. (Id. at 20.) Respondent argues that Petitioner has failed to demonstrate good cause to request discovery for his actual innocence claim where there is no clearly established federal law on the issue. (Id. at 20-21.)

The prosecution presented information from the L & G Grocery robbery and murders and the Lillie & Eddie's Grocery robbery to establish Petitioner's guilt. Petitioner attached a memorandum authored by Mannon related to his conversations with Bell. (See ECF No. 44-24.) The memorandum states,

> Early on September 7, 1982, the writer obtained a Duces Tecum for the employment records of Michael Eugene Sample at the Carrier Corporation. This Duces Tecum subpoena was executed to Mary Bell, clerk in the personnel office. She obtained a record for August 18, 1981, which showed that Sample worked the 7:00 a.m. to 3:30 p.m. shift. She explained that the plant shut down for inventory from July 27, 1981 to August 22, 1981. That there's only limited people working during this shut down. However, the division that Sample worked in making coils for air conditioners always starts up a few days earlier than the rest of the plant. Which probably explains why he was working on the 18th. That record shows that he worked 7:00 a.m. to 3:30 p.m. during that week, and later returned to his 4:00 to 12:00 shift. Reason being that the other set up men that were senior to Sample refused to come back to work early. Therefore, Sample was assigned to work the set up on the day shift to run the condensors [sic]. Ms. Bell stated that she would obtain the new records for the entire month of August and contact the writer when these records had been turned

55

over to her. A copy of Michael Sample's time card is attached to this report.

(Id. at 3.) The time card referenced in the report was not filed with the motion. Contrary to Petitioner's assertion, the Court interprets the memorandum as demonstrating that Sample worked on August 18, 1981, the day of the Lillie & Eddie's Grocery robbery, from 7:00 a.m. to 3:30 p.m. When the shutdown was over after August 22, 1981, Sample went back to his 4:00 p.m. shift. The time cards subpoenaed by the DA's office are not attached to the motion, and it is unclear what information they revealed.

Petitioner contends that he is innocent. There is no clearly established Supreme Court precedent establishing a free-standing habeas claim of actual innocence. See Herrera v. Collins, 506 U.S. 390, 404 (1993) ("A claim of actual innocence is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits."). A defendant, however, may obtain review of a procedurally defaulted claim by demonstrating his "actual innocence." Bousley v. United States, 523 U.S. 614, 622 (1998).

Petitioner seeks time cards for the entire month of August 1981. The request is over-broad. Petitioner has not specifically alleged that he was at work during either the Lillie & Eddie's Grocery robbery or the L & G Grocery robbery. The Court, however, finds that Petitioner's actual-innocence assertions establish good cause for discovery of the time cards for August 18, and August 29,

1981, the dates of the Lillie & Eddie's Grocery robbery and the L & G Grocery robbery and murders.

Petitioner seeks to discover information related to the dates for the Low's Grocery robberies. (See ECF No. 44 at 17.) There was no clear connection made at trial between the Low's Grocery robberies and the L & G Grocery robbery. Annie and Tommy Low did not testify at trial. See Sample, 2010 WL 2384833, at *19. Any identification issues related to the Low's Grocery robberies are not relevant to the determination of Petitioner's guilt. Petitioner has not demonstrated good cause for the time cards from August 7, 1981.

The Court finds that Petitioner has not demonstrated good cause for the depositions of Mannon and Bell.[28] Request C is DENIED IN PART as to the depositions of Mannon and Bell and the request for time cards for the entire month of August 1981. Request C is GRANTED IN PART to the extent Petitioner has demonstrated good cause for discovery of the time cards for August 18 and 29, 1981.

## D.   Consideration Given to Witnesses ("Request D")

Petitioner seeks evidence that the DA and/or the MPD gave consideration to Melvin Wallace, Charles Malone, Eddie Wright, Mike Winfrey (aka Michael Funches), and Gino White, "individuals who testified against Petitioner at trial and/or a pretrial hearing." More specifically, Petitioner seeks:

    1.   Melvin Wallace's Shelby County criminal record from January 1, 1980 until December 31, 1982;

---

[28]   If the DA's file or time cards reveal additional information relevant to establish Petitioner's alibi, Petitioner may seek depositions at that time.

2.  [T]he [DA] file regarding evidence of consideration given to Melvin Wallace;

3.  Charles Malone's criminal file from January 1, 1980 to December 31, 1982;

4.  [T]he MPD's booking file on Charles Malone from August 30, 1981;

5.  [T]he [DA's] investigative and trial files regarding the L & G, Lillie & Eddie's and Low's robberies as they relate to Charles Malone;

6.  [A]ny record of drug related investigations and prosecutions that the [DA] and/or the MPD conducted on Lillie & Eddies's and/or Eddie Wright;

7.  Mike Winfrey's (aka Michael Funches) Juvenile Court file from January 1, 1980 until December 31, 1981;

8.  Mike Winfrey's (aka Mike Funches) Shelby County criminal file from January 1, 1981 until December 31, 1982;

9.  [T]he [DA] file regarding evidence of consideration given to Mike Winfrey (aka Michael Funches);

10. Geno White's[29] juvenile court file from January 1, 1980 until December 31, 1982; and

11. [T]he [DA] file regarding evidence of consideration given to Geno White.

(ECF No. 43 at 4; ECF No. 44 at 18, 25-26.)

Petitioner argues that he has good cause to obtain discovery of evidence of consideration that the DA and MPD gave to the following witnesses who testified against Petitioner: (1) Melvin Wallace; (2) Charles Malone; (3) Eddie Wright; (4) Mike Winfrey; and (5) Gino White. (ECF No. 44 at 18.) Petitioner contends that this information will support his <u>Brady</u>, false testimony, ineffective assistance of counsel, and actual innocence claims.

---

[29]  <u>See</u> <u>supra</u> note 1 and accompanying text.

(Id. at 18-19; see Am. Pet. Claims A.1, A.2, A.9, A.10, D.11, K.14, ECF No. 11, at 7-19, 30, 45, 83.)

Respondent argues that Petitioner's "bald allegation" that these witnesses received consideration for their testimony does not establish good cause because: (1) Petitioner has not demonstrated cause for his failure to previously develop and fully and fairly present the factual basis of this claim to the highest available state court; and (2) Petitioner has failed to demonstrate that discovery would entitle him to habeas relief. (ECF No. 46 at 21.)

**1.   Melvin Wallace ("Requests D1-D2")**

Petitioner points to the following in the record: (1) that Wallace did not identify Petitioner in a lineup two days after the shooting; (2) that McKay would have been the person who shot Wallace; (3) that the first time Wallace identified Petitioner was at a probable-cause hearing; and (4) that Wallace told Petitioner's attorney that he knew Petitioner's name because "I've been told" and "I read it in the paper." (ECF No. 44 at 19.)

Respondent contends that these claims are procedurally defaulted and that Petitioner has not demonstrated cause to excuse the procedural default. (ECF No. 46 at 22.) Respondent argues that Wallace's identification was merely cumulative. (Id. at 22-23.) Respondent further argues that Petitioner failed to allege facts sufficient to support his "bald assertion" that Wallace received consideration in exchange for his testimony. (Id. at 23.)

Wallace admitted that his sole identification of Petitioner was in court and that he had previously viewed lineups where he did

not identify Petitioner. (ECF No. 21-2 at 1882-85.) Wallace
testified that he did identify Petitioner in a lineup, but "[a]t
that time the reason that I didn't put it down was . . . because I
was out of my head, I was sick, and I was taking medication
. . . ." (Id. at 1885-86.) When Wallace was asked if anyone told
him to pick anyone in particular, he testified, "Nobody. Nobody
told me a thing." (Id. at 1887.) Wallace testified that he was
positive that Petitioner was the one who shot him. (Id. at 1904.)

The inconsistency in Wallace's identification of Petitioner
was addressed at trial, and Wallace offered an explanation for his
initial failure to identify Petitioner. In this Order, Petitioner
has been granted discovery of the DA file for Petitioner's case.
See supra p. 44. To that extent, Request D2 for the DA file
regarding evidence of consideration given to Wallace is GRANTED.

Without more specific allegations related to consideration
being given to Wallace, the Court finds that Petitioner has not
demonstrated good cause for discovery of Wallace's Shelby County
criminal record from January 1, 1980, until December 31, 1982.
Request D1 is DENIED.

### 2.   Charles Malone ("Requests D3-D5")

Petitioner notes that Charles Malone, who was arrested with
Defendant Larry McKay and Petitioner, was released the next day
without being charged although Malone fit the physical description
of one of the suspects. (ECF No. 44 at 20.) Charles Rice identified
Malone as a suspect in an August 31, 1981, lineup. (Id.) Petitioner
argues that there was information that three black males were

involved in the Lillie & Eddie's Grocery robbery, and Malone's release contradicts the MPD investigation. (Id. at 20-21.)

Respondent asserts that Petitioner has presented nothing more than a "a bald assertion" and "conclusory allegation." (ECF No. 46 at 24.) Respondent argues that Petitioner has not demonstrated that evidence of consideration would entitle him to relief on his procedurally defaulted and "otherwise meritless" claims. (Id. at 24-25.)

The Court finds that Petitioner has not alleged facts sufficient to demonstrate good cause for discovery of Malone's criminal file. Request D3 is DENIED.

The MPD booking file may show why Malone was released from custody the day after the L & G Grocery robbery.[30] The Court finds that Petitioner has demonstrated good cause for discovery of the MPD booking file for Malone. Request D4 is GRANTED.

The Court has granted Petitioner discovery of the DA files for the L & G Grocery robbery, see supra p. 44. Therefore, Request D5 is GRANTED IN PART to the extent Petitioner is entitled to the discovery of DA files related to Malone's involvement in the L & G Grocery robbery. Request D5 is DENIED IN PART as it relates to whether Malone was considered a suspect in the investigation of the Lillie & Eddie's Grocery robbery, or the Low's Grocery robbery, as these robberies do not determine Petitioner's guilt or innocence of the crimes for which he was convicted and the information sought

---

[30] Petitioner has been granted the MPD files related to the L & G Grocery robbery, see supra pp. 44.

is not likely to resolve any dispute related to an alleged constitutional violation in Petitioner's case.

### 3.   Eddie Wright ("Request D6")

Petitioner argues that he has reason to believe that Eddie Wright regularly sold drugs at Lillie & Eddie's Grocery based on the comments of Willie Everett, the security guard who worked at a market across the street from both Lillie & Eddie's Grocery and the L & G Grocery, that the L & G Grocery was where you buy marijuana and Lillie & Eddie's Grocery was where you buy pills. (ECF No. 44 at 21-22; see ECF No. 44-28 at 1-2.) Petitioner argues that because Wright testified against him, Petitioner has reason to believe that the State gave Wright consideration for his testimony in the form of reduced criminal charges involving drug sales at Lillie & Eddie's Grocery. (ECF No. 44 at 22.)

Respondent argues that the allegations that Wright received consideration in exchange for his testimony are procedurally defaulted. (ECF No. 46 at 25.) Respondent asserts that Petitioner has presented nothing more than a "bald assertion" and a "conclusory allegation" that Wright received consideration for his testimony. (Id.) Respondent argues that Wright's identification of Petitioner is largely collateral and constitutes merely cumulative evidence of Petitioner's guilt. (Id. at 26.)

Petitioner was not convicted of robbing Lillie & Eddie's Grocery. Wright's identification of Petitioner does not establish Petitioner's guilt of the crimes for which he was convicted. The Court finds that Petitioner has not demonstrated good cause for the

discovery of any record of drug-related investigations and prosecutions that the DA and/or the MPD conducted on Lillie & Eddie's Grocery and/or Eddie Wright. Request D6 is DENIED.

### 4.   Mike Winfrey ("Requests D7-D9")

Petitioner argues that he has good cause to obtain discovery to determine whether the DA and/or MPD gave Winfrey consideration in exchange for his testimony; whether the trial court erred in allowing Winfrey to identify Petitioner because Winfrey saw Petitioner at a pretrial hearing and did not have independent knowledge of Petitioner; and whether Petitioner's counsel was unconstitutionally ineffective in his failure to challenge Winfrey's credibility. (ECF No. 44 at 22; see Am. Pet. Claims A.9, D.11, G.20, ECF No. 11, at 30, 45, 64.)

Petitioner asserts that Winfrey's physical description of the suspects in the L & G robbery and murders made after the L & E Grocery preliminary hearing differed from his testimony at the L & G Grocery trial. (ECF No. 44 at 22-23.) The initial description involved three suspects, but at trial Winfrey only admitted to seeing two suspects. (Id. at 23.) Further, Winfrey did not positively identify Petitioner until more than a year after the robbery. (Id.)

Respondent argues that the allegation that Winfrey received consideration in exchange for his testimony is procedurally defaulted and that Petitioner presents no facts to support his claim. (ECF No. 46 at 27.)

Petitioner offers no facts to support his allegations as it relates to Winfrey's juvenile and criminal records. The Court finds that Petitioner has not demonstrated good cause for discovery of those records. Requests D7 and D8 are DENIED.

The Court finds that Petitioner has demonstrated good cause for discovery of the DA file, see supra p. 44, including the DA records related to evidence of consideration given to Winfrey for his testimony at the L & G Grocery trial. Request D9 is GRANTED.

**5.   Gino White ("Requests D10-D11")**

Petitioner asserts that Gino White gave "a vivid, detailed description of what the robbers said and did in [Lillie & Eddie's Grocery], who they interacted with, and where they were positioned." (ECF No. 44 at 24.) Petitioner contends that there is no record of White reporting this information to police and that White's testimony is a recitation of the statement that Billy Smith, a sixteen-year-old employee of Lillie & Eddie's Grocery, gave to the police. (Id.) Petitioner argues that there were issues with White's in-court identification of Petitioner because White never viewed a police lineup and had looked into the courtroom from the hallway prior to testifying about the two people he recognized from the robbery. (Id. at 24-25.) Petitioner contends that, on August 18, 1981, White told the police something different than what he testified to at Petitioner's trial more than a year later. (Id. at 25.)

Respondent argues that the allegation that White received consideration in exchange for his testimony is procedurally

defaulted and that Petitioner offers no facts to support his claim. (ECF No. 46 at 28-29.)

White's testimony related to Lillie & Eddie's Grocery and his identification of Petitioner does not establish Petitioner's guilt or innocence for the crimes of which he was convicted. The Court finds that Petitioner has not asserted specific facts that demonstrate good cause for discovery of White's juvenile court file. Request D10 is DENIED.

The Court finds that Petitioner has demonstrated good cause for the discovery of the DA file, see supra p. 44, which would include DA records related to evidence of consideration given to White for his testimony at the L & G Grocery trial. Request D11 is GRANTED.

**E.   The L & G Grocery and Grover Jones ("Request E")**

Petitioner seeks "information revealing that people affiliated with L & G Grocery were regularly engaged in drug dealing at the grocery store," and "evidence of consideration that the State gave to Grover Jones in exchange for his testimony against Petitioner," and the deposition of Grover Jones. Specifically, Petitioner seeks:

1.   The MPD, FBI, [DA], and drug task force's investigative files involving drug related crimes, drug related arrests/charges/convictions, and search warrants issued at L & G Grocery from January 1, 1979 to December 31, 1982;

2.   [T]he [DA] files regarding consideration [given] to Grover Jones as a result of his statements and/or testimony in Michael Sample's case;

3.   [A]ny record of drug related investigations and prosecutions that the [DA] and/or MPD conducted involving Grover Jones; and

65

4.    [P]ermission to depose Grover Jones.

(ECF No. 43 at 5; ECF No. 44 at 26.)

Petitioner argues that he has good cause: "(1) to obtain evidence that L & G [Grocery] was a known location for drug dealing, (2) to obtain evidence that the State gave Grover Jones consideration for his testimony against Petitioner, and (3) to depose Grover Jones." (ECF No. 44 at 26.) Petitioner contends that this information will enable him to prove that: (1) the State withheld exculpatory evidence about drugs sales at L & G Grocery (Am. Pet. Claim A.3, ECF No. 11, at 19-21); (2) Petitioner's counsel failed to investigate the history of drug-related offenses at L & G Grocery (Am. Pet. Claims C.2, C.5, ECF No. 11, at 32-33, 35-36); (3) Petitioner's counsel failed to effectively challenge the credibility of the State's witnesses, including Grover Jones (Am. Pet. Claim D.11, ECF No. 11, at 45); (4) the State withheld evidence of consideration given to Jones in exchange for his testimony at trial (Am. Pet. Claim A.9, ECF No. 11, at 30); and (5) Petitioner is actually innocent of the crimes of which he was convicted (Am. Pet. Claims A.2, K.14, ECF No. 11, at 14-19, 83). (ECF No. 44 at 26.)

### 1.    Law Enforcement and Prosecution Files Related to Drug Activity ("Requests E1, E3")

Petitioner requests the DA, MPD, FBI, and drug task force files "arising from the investigation of drug sales, search warrants issued, and drug-related arrests/charges/convictions made at the L & G Grocery from January 1, 1979 to December 31, 1982," and any record of drug-related investigations and/or prosecutions

66

that the DA and/or MPD conducted involving Grover Jones. (ECF No. 44 at 26, 29.) Petitioner notes that marijuana was found in the meat coolers at the store and that police questioned Jones about drug dealing at the L & G Grocery on the night of the robbery and murders. (Id. at 27.) Petitioner notes that Everett stated that the L & G Grocery was well-known in the community for selling marijuana. (Id.) Everett claimed that the police knew about the drug dealing, and he believed the police were "getting their share." (Id.)

Respondent argues that the request is overly broad and fails to identify the specific information Petitioner believes his request will uncover. (ECF No. 46 at 31.) Respondent contends that Petitioner's request for unspecified Brady material is a "fishing expedition." (Id.) Respondent further asserts that the Tennessee Court of Criminal Appeals has already determined that evidence concerning drug activity at the L & G Grocery would not be exculpatory. (Id. at 32.) Respondent argues that FBI records are not subject to discovery because Brady does not impose an affirmative duty on the government to take action to discover information which it does not possess, and Petitioner has not alleged that the prosecution had knowledge of any exculpatory evidence possessed by the federal government. (Id. at 32-33.) Respondent contends that because Petitioner was identified by both Melvin Wallace and Charles Rice as the perpetrator, the evidence sought is largely collateral to the overwhelming direct evidence of

Petitioner's guilt and would not affect the verdict or entitle Petitioner to habeas relief. (Id. at 33-34.)

Petitioner focuses on his allegations that Jones sold drugs at the store and asserts that Jones has a history of drug-related convictions from that time period. (ECF No. 44 at 27.) Jones' record shows two drug-related charges from 1974, eight years prior to the murders, which had no disposition. (See ECF No. 44-31.) Even if there was evidence that Jones sold drugs at the L & G Grocery, Petitioner has not established any connection between the drug sales and the robbery and murders other than the possibility that money or drugs may have been a motive for the robbery and murders. That same motive could apply to Petitioner just as it would apply to any other suspect. Proof of drug sales does not negate the identification of Petitioner as a perpetrator or mitigate the murders of the two L & G Grocery clerks.

Jones' testimony at trial was limited to his identification of the victims, money missing from the store, the location of bullet holes, and bullets that were found on the premises. (See ECF No. 21-2 at 1783-93.) None of this testimony directly inculpated Petitioner. Jones stated, "as you know, I have never seen [the robbers], so I can not possibly say it's them." (Id. at 1815.)

Jones' testimony does not prejudice Petitioner, and discovery relating to the collateral matter of whether Jones sold drugs at the L & G Grocery would not exculpate Petitioner. The Court finds that Petitioner has not demonstrated good cause. Requests E1 and E3 are DENIED.

### 2.   Consideration Given to Grover Jones ("Request E2")

Petitioner argues that Jones had a criminal record with drug-related convictions around the time of the robbery and murders, and that the store was the subject of a drug-related search warrant within the year prior to the murders. (ECF No. 44 at 28.) Petitioner states that he has reason to believe that Jones received leniency for his own criminal actions in exchange for his testimony against Petitioner. (Id.)

Respondent argues that Petitioner's claim that Jones received consideration for his testimony is procedurally defaulted and that Petitioner has not demonstrated cause to excuse his failure to previously develop and fully and fairly present the claim. (ECF No. 46 at 34.)

The Court has granted discovery of the DA and MPD files related to the L & G Grocery murders, see supra p. 44, including but not limited to DA files regarding consideration given to Jones as a result of his statements and/or testimony in Petitioner's case. Request E2 is GRANTED.

### 3.   Deposition of Grover Jones ("Request E4")

Petitioner argues that Grover Jones has firsthand knowledge of the regular sale of drugs that occurred at the L & G Grocery, information which would cast doubt on the credibility of the testifying witnesses to the crime and on Petitioner's conviction and sentence. (ECF No. 44 at 29.) Petitioner contends that the State withheld this evidence from the defense. (Id.)

Respondent argues that to the extent the Tennessee Court of Criminal Appeals has already resolved Petitioner's claims relating to alleged drug activity at the L & G Grocery, this Court's review is limited to the record before the state court. (ECF No. 46 at 36.) Respondent again notes that Jones was not a witness to the crime, and his trial testimony did not implicate Petitioner. (Id.) Respondent contends that Jones' deposition would not impact the verdict or demonstrate that Petitioner was entitled to habeas relief. (Id.)

For the same reasons the Court has stated that Petitioner is not entitled to discovery of investigative and prosecution files related to drug sales at the L & G Grocery and to Grover Jones, see supra p. 63, the Court finds that Petitioner has not demonstrated good cause to take Jones' deposition. Request E4 is DENIED.

## F.  DA & MPD Files Regarding Lillie & Eddie's Grocery ("Request F")

Petitioner seeks the "all records from the [DA] and MPD concerning investigation, prosecution, and post-conviction proceedings arising from the August 18, 1981, robbery at Lillie & Eddie's Grocery," and more specifically "the entire MPD investigative files as well as the entire [DA] files, including the investigative and grand jury files, involving the August 18, 1981 robbery at Lillie & Eddie's." These files should include, but are not limited to, the following:

1.  [T]he three cards worth of fingerprints that the MPD collected from the Lillie & Eddie's crime scene . . . ;

70

2.   [T]he names corresponding with the Bureau of Investigation numbers that produced negative results when compared to prints that the MPD collected from the Lillie & Eddie's crime scene . . . ;

3.   [T]he photographs and names of suspects in the mug books that the MPD showed to witnesses Johnny Lynn Smith, Eddie Wright, and Billy Smith on August 19, 1981 with notations for who each witness identified;

4.   [T]he names and photographs of suspects that the MPD showed to Geno White on August 25, 1982 - a year after the offense, in preparation for his trial testimony;

5.   [T]he names and photographs of suspects that the MPD showed Mike Winfrey on August 27, 1982 - a year after the offense, in preparation for his trial testimony;

6.   [T]ranscripts of the grand jury proceedings and any other preliminary proceedings involving the August 18, 1981 robbery at Lillie & Eddie's; and

7.   [T]he indictment reflecting the charges against Petitioner and/or Larry McKay for the Lillie & Eddie's robbery.

(ECF No. 43 at 6-7; ECF No. 44 at 33.)

Petitioner argues that he has good cause for the discovery of these records because the State violated his constitutional rights by presenting evidence related to the Lillie & Eddie's Grocery robbery when the robbery was only potentially relevant to Petitioner's co-defendant's identity, and neither Petitioner, nor his co-defendant were convicted of committing the Lillie & Eddie's Grocery robbery. (ECF No. 44 at 29-30.) Petitioner contends that discovery of the State's file will allow him to demonstrate that he was not involved in the Lillie & Eddie's Grocery robbery (see Am. Pet. Claims A.2, A.6, ECF No. 11, at 14-19, 25); the State

71

knowingly presented false testimony about Petitioner's involvement in the Lillie & Eddie's Grocery robbery and withheld exculpatory information about witnesses' failure to identify Petitioner (Am. Pet. Claims A.6, A.7, ECF No. 11, at 25-27); the State committed prosecutorial misconduct by introducing evidence of the Lillie & Eddie's Grocery robbery at the L & G Grocery trial (Am. Pet. Claim H.2, ECF No. 11, at 68); counsel was ineffective for failing to investigate the Lillie & Eddie's Grocery robbery (Am. Pet. Claims C.2, C.6, D.8, ECF No. 11, at 32, 36-37, 43); the trial court erred in allowing evidence of the Lillie & Eddie's Grocery robbery at the L & G Grocery trial (Am. Pet. Claim G.26, ECF No. 11, at 66); and the trial court erred in failing to sever the trial given the obvious evidence of McKay's culpability and the lack of evidence of Petitioner's culpability (Am. Pet. Claims B.1-B.3, G.3, ECF No. 11, at 30-31, 60-61). (ECF No. 44 at 30.)

Petitioner argues that on the night of the Lillie & Eddie's Grocery robbery, multiple witnesses stated that three men were involved in that robbery. (Id.) However, at trial, the State characterized the Lillie & Eddie's Grocery robbery as the work of two men, Petitioner and McKay. (Id.) Petitioner seeks to obtain additional information to show that others were involved, that he was not involved, and that the State withheld this evidence. (Id. at 31.) Petitioner contends that Wright did not identify him as one of the persons responsible for the crime, although Petitioner was

in the August 31, 1981, lineup. (_Id._)[31] Petitioner believes that
Billy Smith, a store employee, identified someone other than
Petitioner from a mug book as a suspect, and that the State
withheld this information. (ECF No. 44 at 31-32.) Petitioner
contends that the State also withheld information about Johnny Lynn
Smith, a twelve-year-old store employee. (_Id._ at 32.) Johnny Smith
recently informed Petitioner's defense team that he went to a
police precinct on August 19, 1981, with Wright to view photos.
(_Id._) Wright pointed to a picture and said "that's him!" (_Id._)
Johnny Smith told Wright that he did not recognize the man, but
Wright told Johnny Smith, "Trust me. That's him!" (_Id._)

Respondent argues that Petitioner's request is overly broad
and that Petitioner has not demonstrated good cause. (ECF No. 46 at
38.) Respondent argues that the Tennessee Court of Criminal Appeals
has already deemed evidence offered to show that three individuals
were involved in the Lillie & Eddie's Grocery robbery is immaterial
and insufficient to support a _Brady_ claim. (_Id._ at 39.) He argues
that the Tennessee Supreme Court has determined that the decision
not to sever the defendants' trial was proper and that this Court
is limited to the review of the record before the state court on
these issues. (_Id._)

Respondent asserts that the MPD reports from August 18, 1981,
and November 17, 1981, that Petitioner relies on to demonstrate
good cause included statements from Michael Winfrey and Berry

---

[31]   When viewing the lineup, Wright made a notation that both Petitioner
and Charles F. Malone resembled one of the Lillie & Eddie's Grocery robbers. (ECF
No. 44-12.)

73

Chambers that were never presented to the highest available state courts. (Id.) Respondent contends Petitioner does not indicate when or how he first obtained these reports or when he first learned that these witnesses claimed there were three suspects for the robbery. (Id. at 40.) Respondent argues that any claim stemming from these reports is procedurally defaulted. (Id. at 39.)

Respondent asserts that Petitioner knew about Wright's inability to identify him when he filed his post-conviction petition, but failed to present the allegation to the Tennessee Court of Criminal Appeals. (Id. at 40.) Respondent argues that claims related to Wright's identification are procedurally defaulted. (Id.)

Respondent argues that Petitioner did not include specific allegations about Billy Smith and Johnny Smith or their identification of a suspect other than Petitioner; Respondent asserts that Petitioner's claim would fail under Habeas Rule 2(c). (Id. at 41-42.) Respondent further asserts that because no claims related to Billy Smith and Johnny Smith were presented in the state court, these allegations are procedurally defaulted. (Id.) Further, Respondent argues that the materials offered by Petitioner and the discovery sought are largely collateral to Petitioner's conviction. (Id. at 43.)

The Tennessee Supreme Court determined that evidence related to the Lillie & Eddie's Grocery robbery was relevant to Petitioner's case, specifically to the issue of whether the defendants were in possession of the same .45 caliber pistol taken

74

from the Lillie & Eddie's Grocery and to the identity of the
killers. See McKay, 680 S.W.2d at 452. Further, Officer Schwill,
Eddie Wright, Darrell Perry, Gino White, and Mike Winfrey all
testified about the Lillie & Eddie's Grocery robbery at the L & G
Grocery trial. Evidence in the DA and MPD files related to the
Lillie & Eddie's Grocery robbery may allow Petitioner to establish
cause for procedural default and resolve disputes related to his
false testimony, Brady, and due process claims.

The Court finds that Petitioner has demonstrated good cause
for discovery of DA and MPD files regarding the Lillie & Eddie's
Grocery robbery. Request F is GRANTED.

**G.   Law Enforcement Records Related to Drugs at Lillie & Eddie's
Grocery ("Request G")**

Petitioner requests "MPD, FBI, [DA] and drug task force
investigative files involving drug related crimes, drug related
arrests/charges/convictions, and search warrants stemming from drug
activity at Lillie & Eddie's Grocery from January 1, 1979 to
December 31, 1982." (ECF No. 43 at 7; ECF No. 44 at 34-35.)

Petitioner argues that he has good cause for the discovery of
these records because the information contained in these records
will help him prove that the State withheld exculpatory evidence
that drugs were sold at Lillie & Eddie's Grocery (Am. Pet. Claim
A.7, ECF No. 11, at 26-27); that Petitioner's counsel failed to
investigate the history of drug-related offenses at Lillie &
Eddie's Grocery which would have shown that people other than
Petitioner were responsible for the Lillie & Eddie's Grocery
robbery and the L & G Grocery robbery and murders (Am. Pet. Claim

75

C.6, ECF No. 11, at 36-37); and that Petitioner's counsel failed to effectively challenge the credibility of the State's witnesses (Am. Pet. Claim D.11, ECF No. 11, at 45). (ECF No. 44 at 34.) Petitioner relies on information from Everett that Lillie & Eddie's Grocery was well-known in the community for selling pills and that the police and residents in the community knew about the drug activities at the store. (Id.; ECF No. 44-28.)

Respondent argues that Petitioner's request is overly broad, constitutes a "fishing expedition," fails to identify specific information Petitioner believes his request will uncover, and does not include sufficient supporting facts to identify the specific evidence or information sought. (ECF No. 46 at 44.) Respondent contends that the claims pertaining to Everett are procedurally defaulted and that Petitioner has failed to demonstrate that the factual predicate for the claims could not have been previously discovered. (Id. at 44-45.) Respondent contends that Petitioner has not demonstrated good cause for the discovery of FBI records because Brady does not impose an affirmative duty on the government to take action to discover information which it does not possess. (Id. at 45-46.)

Information related to drug activity at Lillie & Eddie's Grocery is collateral to Petitioner's case and not material to the investigation or prosecution of the crimes committed at the L & G Grocery, see supra pp. 62-63. Petitioner continues to seek discovery of information about drug activity at Lillie & Eddie's Grocery, but has not presented any facts to demonstrate how that

drug activity will absolve him of criminal responsibility for the L & G Grocery robbery and murders.

The Court finds that Petitioner has not demonstrated good cause for discovery of law enforcement records related to drug activity at Lillie & Eddie's Grocery. Request G is DENIED.

## H. DA and MPD Records for the Low's Grocery Robberies ("Request H")

Petitioner seeks "all records from the [DA] and the [MPD] concerning the investigation and grand jury proceedings arising from the robberies of Low's Grocery & Market [on] August 29, 1981 and August 7, 1981," including

1. The complete investigative and grand jury files from the MPD and the [DA] for the Low's robberies on August 7, 1981 and August 29, 1981;

2. James Nunley's (aka James Nummery, aka James Nunnlley) statement regarding the August 7, 1981 Low's robbery and any documents related to its preparation and (non)use;

3. [A]ny statements or documentation regarding a witness statement taken from Jackie, James Nunley's acquaintance, who witnessed the August 7, 1981 robbery;

4. [I]nformation pertaining to the marked Cobra Alarm $10 bill from the August 29, 1981 robbery;

5. [R]ecords of fingerprint evidence collected at the crime scene following both robberies and results of any fingerprint comparisons . . . ;

6. [S]ubsequent pages of witness Alma Jo Jones's statement to police regarding the August 29, 1981 robbery . . . ;

7. [S]ubsequent pages of witness Luther James Ward's statement to police regarding the August 29, 1981 robbery . . . ; and

8. [A] readable copy of the four-page MPD Supplementary Offense Report regarding the August

29, 1982 Low's robbery, reported by [Sergeant] R.L.
True and [Sergeant] R.G. Wright.

(ECF No. 43 at 7-8; ECF No. 44 at 38-39.)

Petitioner asserts that he has good cause for discovery of the State's investigative materials from the August 7, 1981, and August 29, 1981, Low's Grocery robberies because the State investigated the Low's Grocery robberies in conjunction with the L & G Grocery and Lillie & Eddie's Grocery robberies. (ECF No. 44 at 35.) Petitioner contends that the State's investigative theory was that the L & G Grocery robbery was the culmination of a crime spree that included the two Low's Grocery robberies and the Lillie & Eddie's Grocery robbery. (Id.) Petitioner asserts that, in reality, there was only evidence of McKay's participation, and not Petitioner's participation, in the Low's Grocery robberies. (Id.) Petitioner argues that the State violated Brady by not disclosing exculpatory information related to the Low's Grocery robberies. (Id.) Petitioner believes that the State did not introduce evidence of the Low's Grocery robberies at the L & G Grocery trial because they "couldn't pin" the Low's Grocery robberies on Petitioner. (Id.) Petitioner notes that Annie and Tommy Low did not identify Petitioner as the perpetrator in the August 31, 1981, lineup, but both of them identified McKay as the perpetrator. (Id. at 36-37.)

Petitioner's defense team recently spoke with James Nunley, a witness to the August 7, 1981, robbery, and he reported that an officer spoke with him shortly after the robbery. (Id. at 37.) Nunnley told the police detailed information about the suspects, including that he recognized their voices from the neighborhood.

78

(Id.) Petitioner argues that when police told Nunley they found the person who was responsible for the Low's Grocery robbery, the L & G Grocery robbery had not yet taken place. (Id. at 38.) Petitioner contends that he is entitled to know who the police believed was responsible for the Low's Grocery robbery. (Id.)

Respondent argues that Petitioner's request is overly broad. (ECF No. 46 at 47.) Respondent argues that the Tennessee Court of Criminal Appeals deemed Annie Low's inability to positively identify Petitioner as the perpetrator not to be exculpatory and as immaterial to Petitioner's guilt or innocence. (Id. at 48.) Respondent contends that the Court's review is limited to the record before the state court. (Id.) Respondent contends that to the extent Petitioner's Motion raises allegations not previously presented in the state court, those allegations are procedurally defaulted. (Id.) Respondent contends that Petitioner knew that Annie Low, Tommy Low, and Alma Jones witnessed the Low's Grocery robbery when he filed his January 27, 1995, petition for post-conviction relief, that the witnesses failed to identify him, and that some of the witnesses identified other individuals as the perpetrator. (Id. at 49.)

Identification issues related to the Low's Grocery robberies are not exculpatory or relevant to the determination of Petitioner's guilt or innocence of the crimes committed at L & G Grocery, see supra p. 57.

The Court finds that Petitioner has not demonstrated good cause for discovery of law enforcement records related to the Low's Grocery robberies. Request H is DENIED.

**I.   Certain Individuals' MPD and DA Files ("Request I")**

Petitioner seeks "[MPD] and [DA] files regarding the investigation and/or prosecution of the following individuals from January 1, 1980 to December 31, 1982," specifically

    1.   Individuals suspected of participating in the August 29, 1981 robbery and murders at L & G Grocery and/or individuals who knew of the ongoing criminal activities at L & G Grocery

        a.   Wilbur White (aka Big White)

        b.   Leeaster McKay, Jr. (aka Leester McKay, Jr., aka Junebug)

        c.   Ralph Franklin

        d.   James D. Coleman and Derrick Tolliver

        e.   Charles Malone

        f.   Ricky Peete

    2.   Individuals suspected of participating in the August 18, 1981 robbery of Lillie & Eddie's Grocery, and/or individuals who knew of the ongoing criminal activities at Lillie & Eddie's Grocery

        a.   Marvin Phillips

        b.   Sammy House

        c.   Eddie Lewis Wright

        d.   Michael Wright

        e.   Michael Winfrey (aka Michael Funches)

    3.   Individuals suspected of participating in the August 7, 1981 and August 29, 1981 robberies of Low's Grocery:

        a.   Tommy Lee Bradford

b.   Ralph Franklin

(ECF No. 43 at 8-9; ECF No. 44 at 39-49.)

**1.   Individuals Suspected of Participating in the August 29, 1981, Robbery and Murders at the L & G Grocery and/or Individuals who Knew of the Ongoing Criminal Activities at the L & G Grocery ("Request I1")**

Petitioner argues that he has good cause for discovery of law-enforcement files for the individuals suspected of participating in the August 29, 1981, L & G Grocery robbery and murders, and/or individuals who knew of the ongoing criminal activities at L & G Grocery because it will enable Petitioner to prove the following claims:  that the State withheld exculpatory information (Am. Pet. Claims A.2, A.3, ECF No. 11, at 14-19); that the State withheld evidence of consideration given in exchange for testimony against Petitioner (Am. Pet. Claim A.9, ECF No. 11, at 30); that Petitioner's trial counsel was ineffective (Am. Pet. Claims C.2, C.5, D.11, ECF No. 11, at 32-33, 35-36, 45); and that Petitioner is actually innocent of the offense of which he was convicted (Am. Pet. Claims A.2, K.14, ECF No. 11, at 14-19, 83). (See ECF No. 44 at 39-43.)

Petitioner asserts that he has good cause for discovery of law-enforcement files for the following individuals:

Wilbur White because Petitioner claims that White was in front of the L & G Grocery at the time the robbery and murders occurred and used a pay phone outside the L & G Grocery immediately after the incident (id. at 39-40; ECF No. 44-13 at 3);

81

Leeaster McKay, Jr. (aka Leester McKay, Jr., aka Junebug), co-defendant Larry McKay's brother, because Charles Malone made a statement to police that Leeaster McKay's street name was "Junebug," Grover Jones made a statement to police that "Junebug" fit the description of the perpetrator who robbed his store, and Grover Jones testified at trial that he believed "Junebug" was responsible for the L & G Grocery robbery and murders (ECF No. 44 at 40);

Ralph Franklin, Larry McKay's cousin, because Melvin Wallace identified Franklin as the perpetrator of the L & G Grocery robbery and murders, Annie Low tentatively identified Franklin as the person responsible for the August 29, 1981, Low's Grocery robbery, Franklin's alibi was connected to Charles Malone, another suspect in the L & G Grocery robbery and murders, and Officer D.W. Robertson testified that he filled in the lineup with people from the jail and that Franklin had to have been recently arrested on a criminal charge to be in the lineup (id. at 41);

James D. Coleman and Derrick Tolliver because they were suspects in an armed robbery that occurred five hours after the L & G Grocery robbery and murders, about two miles away from the L & G Grocery, and the armed robbery was carried out with the same type of .45 caliber automatic weapon used in the L & G Grocery incident (id. at 42; see ECF No. 44-30 at 5);

Charles Malone because Malone was arrested with Petitioner and his co-defendant McKay, Malone was released by the police on the same evening as the arrest for the L & G Grocery robbery and

82

murders without charges, and Malone was identified as a suspect by Charles Rice (ECF No. 44 at 42); and

Ricky Peete, purportedly Grover Jones' business partner, because Jones claimed that Peete had a store on Vollintine Avenue where he sold drugs and because Peete faced federal charges for receiving cash payments in exchange for influencing votes while an elected member of the city council (id. at 43).

Respondent asserts that the allegations regarding Franklin and Peete have already been found to be insufficient to support a Brady claim by the Tennessee Court of Criminal Appeals (ECF No. 46 at 55, 60); that the allegations regarding White, McKay, Franklin, Coleman, Tolliver, Malone, and Peete are procedurally defaulted because they were never presented to the highest available state court (id. at 52, 53, 55-57, 59-60); that Petitioner's claims based on information pertaining to White, McKay, Franklin, Coleman, Tolliver, Malone, and Peete "rely upon a factual predicate that could . . . have been previously discovered through the exercise of due diligence" (id. at 52, 54, 56-57, 59-60); that law-enforcement records on White, McKay, Franklin, Coleman, Tolliver, Malone, and Peete would not have cast doubt on the overwhelming evidence of Petitioner's guilt and would not have had any impact on the jury's verdict (id. 52-54, 56, 58-61); and that Petitioner's claims based on the discovery sought as to Franklin under Request I1 pertain to the Low's Grocery robberies, which is a collateral matter (id. at 56).

Insofar as Petitioner's request is for law-enforcement files on the aforementioned individuals not directly relating to the L & G Grocery robbery and murders of which Petitioner was convicted, Petitioner's request is overly broad. Petitioner has not demonstrated a sufficient connection between the requested files and the L & G Grocery robbery and murders. Since Petitioner has already been granted discovery of the MPD and DA files related to the L & G Grocery robbery and murders, see supra p. 44, Petitioner should be able to obtain information related to other suspects in the L & G Grocery robbery and murders.

The Court finds that Petitioner has not shown good cause for the discovery of these materials. Request I1 is DENIED.

### 2. Individuals Suspected in the Robbery of, and/or Familiar with Ongoing Criminal Activities at, Lillie & Eddie's Grocery ("Request I2")

Petitioner argues that he has good cause for discovery of law-enforcement files for the individuals suspected of participating in the August 18, 1981, Lillie & Eddie's Grocery robbery, and/or individuals who knew of the ongoing criminal activities at Lillie & Eddie's Grocery because it will enable Petitioner to prove the following claims: that the State withheld exculpatory information (Am. Pet. Claim A.6, ECF No. 11, at 25-26); that the State withheld evidence of consideration given in exchange for testimony against Petitioner (Am. Pet. Claim A.9, ECF No. 11, at 30); that the State committed prosecutorial misconduct (Am. Pet. Claim H.2, ECF No. 11, at 68); that Petitioner's trial counsel was ineffective (Am. Pet. Claims C.6, D.11, D.14, ECF No. 11, at 36-37, 45); that the trial

court erred in allowing evidence of the Lillie & Eddie's Grocery robbery to be presented at the L & G Grocery trial (Am. Pet. Claim G.26, ECF No. 11, at 66); and that Petitioner is actually innocent of the offense of which he was convicted (Am. Pet. Claims A.2, K.14, ECF No. 11, at 14-19, 83). (See ECF No. 44 at 44-48.)

Petitioner asserts that he has good cause for discovery of law-enforcement files for the following individuals:

Marvin Phillips because witnesses identified Phillips as being involved in the Lillie & Eddie's Grocery robbery, Wright told the police that Phillips might be responsible for the Lillie & Eddie's Grocery robbery, and the police investigation resulting in the discovery that a car seen driving away from Lillie & Eddie's Grocery immediately after the robbery belonged to Phillips (id. at 44-45);

Sammy House because witnesses, including Wright, identified House as the Lillie & Eddie's Grocery robber and House was known in the neighborhood as a "holdup man" (id. at 45; see ECF No. 44-30 at 4);

Eddie Lewis Wright, owner of Lillie & Eddie's Grocery, because Lillie & Eddie's Grocery was well-known in the community for selling pills (ECF No. 44 at 46);

Michael Wright, Eddie Lewis Wright's son, because of the alleged drug sales occurring at Lillie & Eddie's Grocery and Michael Wright's statement to the police that the .45 caliber gun that he purchased was stolen during the Lillie & Eddie's Grocery robbery (id. at 46-47); and

Michael Winfrey (aka Michael Funches) because Winfrey witnessed the Lillie & Eddie's Grocery robbery, testified at the L & G Grocery trial, gave inconsistent statements about the Lillie & Eddie's Grocery robbery, and made other misstatements at the L & G Grocery trial (ECF No. 44 at 47-48).

Respondent asserts that the allegations regarding House have already been found to be insufficient to support a Brady claim by the Tennessee Court of Criminal Appeals (ECF No. 46 at 63); that the allegations regarding Phillips, House, Eddie Wright, Michael Wright, and Winfrey are procedurally defaulted because they were never presented to the highest available state court (id. at 61, 63-64, 66-67); that Petitioner's claims based on information pertaining to Phillips, House, Eddie Wright, Michael Wright, and Winfrey "rely upon a factual predicate that could . . . have been previously discovered through the exercise of due diligence" (id. at 61-63, 65-68); and that Petitioner's claims based on the discovery sought as to Phillips, House, Eddie Wright, Michael Wright, and Winfrey under Request I2 pertain to the Lillie & Eddie's Grocery robbery, which is collateral to Petitioner's claims (id. at 62-63, 65-66, 68).

Petitioner's Request I2 is overly broad because Petitioner has not shown a sufficient connection between the information sought and the L & G Grocery robbery and murders of which Petitioner was convicted, and the request is not limited to those crimes that were at issue at Petitioner's trial. Petitioner has already been granted discovery of the files related to the L & G Grocery robbery and

86

murders, <u>see</u> <u>supra</u> p. 44. With these files, Petitioner should be able to obtain <u>Brady</u> evidence related to his conviction. As a result, Petitioner's Request I2 constitutes nothing more than a "fishing expedition."

The Court finds that Petitioner has not shown good cause for discovery of these materials.  Request I2 is DENIED.

3.   **Individuals Suspected of Participating in the August 7, 1981, and August 29, 1981, Low's Grocery Robberies ("Request I3")**

Petitioner argues that he has good cause for discovery of law-enforcement files for the individuals suspected of participating in the August 7, 1981, and August 29, 1981, Low's Grocery robberies because it will enable Petitioner to prove the following claims: that the State withheld exculpatory information (Am. Pet. Claims A.2, A.6, ECF No. 11, at 14-19, 25-26); that Petitioner's trial counsel was ineffective (Am. Pet. Claim C.7, ECF No. 11, at 37-38); and that Petitioner is actually innocent of the offense of which he was convicted (Am. Pet. Claims A.2, K.14, ECF No. 11, at 14-19, 83). (<u>See</u> ECF No. 44 at 48-49.)

Petitioner asserts that he has good cause for discovery of law-enforcement files for the following individuals:

Tommy Lee Bradford because twelve-year-old witness Franklin Wright and Ms. Wright identified Bradford as the perpetrator of the August 29, 1981 Low's Grocery robbery (<u>id.</u> at 48-49); and

Ralph Franklin because Annie Low identified Franklin, as well as Larry McKay, as responsible for the August 29, 1981, Low's

Grocery robbery which occurred mere hours before the L & G Grocery crimes (id. at 49).

Respondent asserts that the allegations regarding Bradford and Franklin have already been found to be immaterial and insufficient to support a Brady claim by the Tennessee Court of Criminal Appeals (ECF No. 46 at 68-69, 70-71); that the allegations regarding Bradford and Franklin are procedurally defaulted because they were never presented to the highest available state court (id. at 69, 71); that Petitioner's claims based on information pertaining to Bradford and Franklin "rely upon a factual predicate that could . . . have been previously discovered through the exercise of due diligence" (id.); and that Petitioner's claims based on the discovery sought as to Bradford and Franklin under Request I3 pertain to the Low's Grocery robberies, which are collateral to Petitioner's claims (id. at 70, 72).

Petitioner has not shown good cause for the discovery of materials sought pursuant to Request I3. There was no clear connection made at trial between the Low's Grocery robberies and the L & G Grocery crimes. Discovery related to the Low's Grocery robberies concerns a wholly collateral matter that is not relevant to the determination of Petitioner's guilt for the crimes of which he was convicted, see supra pp. 57, 77-80. Further, for the reasons stated above, Petitioner has not demonstrated good cause for the discovery of law-enforcement files on Franklin, see supra pp. 81-84. As a result, Petitioner's Request I3 constitutes nothing more than a "fishing expedition."

88

The Court finds that Petitioner has not shown good cause for the discovery of these materials. Request I3 is DENIED.

### VIII. CONCLUSION

For the foregoing reasons, Petitioner's Motion for Discovery is GRANTED IN PART and DENIED IN PART.

Request A is GRANTED.

Request B is DENIED.

Request C is GRANTED IN PART to the extent Petitioner has demonstrated good cause for discovery of the time cards for August 18 & 29, 1981, and DENIED IN PART as to the depositions of Mannon and Bell and the request for time cards for the entire month of August 1981.

Request D is GRANTED IN PART and DENIED IN PART. Request D1 is DENIED; Request D2 is GRANTED; Request D3 is DENIED; Request D4 is GRANTED; Request D5 is GRANTED IN PART to the extent Petitioner is entitled to the discovery of DA files related to Charles Malone's involvement in the L & G robbery and DENIED IN PART as it relates to whether Malone was considered a suspect in the investigation of the Lillie & Eddie's Grocery robbery or the Low's Grocery robbery as these robberies do not determine Petitioner's guilt or innocence of the crimes for which he was convicted; Requests D6-D8 are DENIED; Request D9 is GRANTED; Request D10 is DENIED; and Request D11 is GRANTED.

Request E is GRANTED IN PART and DENIED IN PART. Request E1 is DENIED; Request E2 is GRANTED; Requests E3-E4 are DENIED.

Request F is GRANTED.

Request G is DENIED.

Request H is DENIED.

Request I is DENIED.

**SO ORDERED** this 23nd day of July, 2013.

s/ Jon P. McCalla
JON P. McCALLA
CHIEF U.S. DISTRICT JUDGE